1
2
3
4                              UNITED STATES DISTRICT COURT
5                                    DISTRICT OF NEVADA
6                                          * * *
7    KARL E. RISINGER,                          Case No. 2:12-cv-00063-MMD-PAL
                              Plaintiff,
8         v.                                              ORDER
9    SOC LLC, et al.,                             (Def.'s Motion to Seal – dkt. no. 31;
                                                  Def.'s Motion to Dismiss – dkt. no. 32)
10                            Defendants.
11
12   **I.    SUMMARY**
13          This case presents important questions concerning the application of state,
14   federal, and foreign law to an employment dispute arising out of an American
15   contractor's work in Iraq.  Before the Court are Defendants' SOC LLC, SOC-SMG, Inc.,
16   and Day & Zimmerman's Motions to Seal and to Dismiss.  (Dkt. nos. 31 and 32.)  For the
17   reasons discussed below, the motions are granted in part and denied in part.
18   **II.   BACKGROUND**
19          Between March 2010 and March 2011, Plaintiff Karl E. Risinger, a California
20   resident, was employed as an armed guard by SOC[1] providing security assistance to the
21   United States military in the Republic of Iraq.  SOC LLC is a Delaware limited liability
22   company with its principal place of business in Nevada, and is owned by SOC-SMG,
23   Inc., a Nevada corporation, and Day & Zimmerman, a Maryland corporation.  (First
24   Amended Compl. ("FAC"), dkt. no. 19 at ¶¶ 2-4.)  Risinger alleges that he was recruited
25   by SOC LLC — a company providing security services for "individuals, domestic facilities,
26   _____
27          [1]Risinger refers to Defendants SOC LLC, SOC-SMG, Inc., and Day &
     Zimmerman, Inc. as "SOC" in his briefings.  For the purposes of clarity, the Court adopts
28   the same nomenclature when referring to all entity defendants.

nuclear power plants and military bases," (FAC at ¶ 5) — to serve as an armed guard at 16 sites in Iraq in support of the United States military.  Risinger travelled to Nevada to sign his employment agreement and receive training, and was thereafter deployed to Iraq.  (*Id.* at ¶ 15.)  He alleges that contrary to his written employment agreement, he was not paid his represented salary, and was forced to work without meal or rest periods, seven days a week, and without overtime compensation.  (*Id.* at ¶ 1.)  Risinger also alleges that SOC "systematically falsified employee time sheets to reflect time off when there was none."  (*Id.*)

On December 19, 2010, Risinger brought this suit in state court against the SOC entities and 20 unnamed individuals on behalf of himself and a class of security guards employed by SOC alleging common law violations, as well as violations of Nevada's employment law, Iraqi labor law, and the federal Fair Labor Standards Act.

SOC removed the action to this Court on January 13, 2012.  (*See* dkt. no. 1.)  After SOC first moved to dismiss the claims, Risinger filed his FAC on March 8, 2012.  SOC now brings a second Motion to Dismiss, as well as a Motion to Seal.  (Dkt. nos. 31 and 32.)

## III.  DEFENDANTS' MOTION FOR LEAVE TO FILE MOTION TO DISMISS UNDER SEAL

Defendants seek Court leave to file their Motion to Dismiss under seal, arguing that the Motion and its appendix (the "Appendix") contains "confidential, proprietary, competition-sensitive, and military-sensitive information" that should not be publically disclosed.  Risinger opposes the Motion.  (Dkt. no. 34.)  In their Reply, Defendants represent to the Court that the parties have conferred on this Motion, and with one exception have agreed to permit unredacted versions of the Motion and Appendix to be filed under seal.  The Court agrees that the redacted version shall be filed publically, and the unredacted versions shall be filed under seal.  With respect to the lone disagreement concerning Section 3.1 of the Performance Work Statement in SOC's Government Contract, the Court sides with Risinger.  As that portion of the Contract does not contain

1   sensitive information requiring protection from public disclosure, the Court instructs SOC

2   to include that section with its public filings.

3   **IV.    DEFENDANTS' MOTION TO DISMISS**

4           As discussed above, Risinger brings a panoply of claims against SOC.   Among

5   them   include   various   common   law   violations   (promissory   fraud,   negligent

6   misrepresentation, tortious and contractual unjust enrichment, money had and received,

7   breach of contract, breach of covenant of good faith and fair dealing, quantum meruit),

8   violations of Nevada employment law (failure to pay overtime wages, failure to provide

9   meal and rest periods, failure to timely pay wages, failure to maintain records of wages),

10  violations of Iraqi law (unlawful overtime, unlawful denial of rest periods, unlawful denial

11  of rest days, failure to pay overtime wages), and one violation of the Fair Labor

12  Standards Act (failure to pay overtime wages).   SOC seeks dismissal of the FAC on

13  numerous grounds that fall roughly within two categories of argument: Risinger failed to

14  plead with specificity facts to support a plausible claim for relief; and the relief claimed by

15  Risinger is unavailable in any of the state, federal, or Iraqi bodies of law that Risinger

16  brings his non-common law claims under.

17          **A.    Legal Standard**

18          A court may dismiss a plaintiff's complaint for "failure to state a claim upon which

19  relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A properly pled complaint must provide

20  "a short and plain statement of the claim showing that the pleader is entitled to relief."

21  Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While

22  Rule 8 does not require detailed factual allegations, it demands more than "labels and

23  conclusions" or a "formulaic recitation of the elements of a cause of action."  *Ashcroft v.*

24  *Iqbal*, 556 US 662, 678 (2009) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

25  "Factual allegations must be enough to rise above the speculative level."  *Twombly*, 550

26  U.S. at 555.  Thus, to survive a motion to dismiss, a complaint must contain sufficient

27  factual matter to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at

28  678 (internal citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss.  First, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth.  *Iqbal*, 556 U.S. at 679.  Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice.  *Id.* at 678.  Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief.  *Id.* at 679.  A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct.  *Id.* at 678.  Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged–but not shown–that the pleader is entitled to relief."  *Id.* at 679 (internal quotation marks omitted).  When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed.  *Twombly*, 550 U.S. at 570.

A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989) (emphasis in original)).

### B.    Analysis

The Court addresses each of SOC's arguments in the order raised in the Motion.

### 1.    Specificity of Defendants

SOC lodges its first attack on Risinger's FAC by arguing that it does not put each specific defendant on sufficient notice of the allegations against them. The level of specificity that SOC demands, however, is not required at the pleadings stage.  First, the Court dismisses, with leave to amend, claims against the 20 unnamed Doe Defendants. As a general rule, the use of Doe pleading is disfavored in federal courts.  *Gillespie v. Civiletti*, 629 F.3d 637, 642 (9th Cir. 1980).  Risinger fails to allege with particularity that the individual defendants were involved in the alleged misconduct.  Given, however, that

1    the identities of any individuals involved in the challenged conduct would not be known

2    to him, Risinger will be afforded "an opportunity through discovery to identify the

3    unknown defendants, unless it is clear that discovery would not uncover the identities, or

4    that the complaint would be dismissed on other grounds." *Id.* Accordingly, the Court

5    dismisses the claims against the individual defendants with leave to amend should

6    plausible claims for relief be uncovered against new defendants during discovery.

7         The remaining three entity defendants are identified as SOC LLC, the contracting

8    employer of Risinger, as well as the two co-owners of SOC LLC.  Accordingly, the Court

9    declines to characterize Risinger's FAC as a "shotgun pleading" against "an

10   undifferentiated mass of 'Defendants.'"  (Dkt. no. 32 at 3 and 4.)  The FAC alleges that

11   SOC-SMG, Inc. and Day & Zimmerman, Inc. are alter egos of SOC LLC.[2]  (FAC at ¶ 10.)

12   In addition, Risinger attached to the FAC the employment agreement between himself

13   and SOC LLC, as well as allegedly fraudulent time sheets produced by SOC LLC.  (*See*

14   FAC, exs. A and B); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542,

15   1555 n.19 (9th Cir.1990) (citations omitted) ("Generally, a district court may not consider

16   any material beyond the pleadings in ruling on a Rule 12(b)(6) motion. . . .  However,

17   material which is properly submitted as part of the complaint may be considered on a

18   motion to dismiss.").   There is no ambiguity or confusion as to who the relevant

19   _____

20        [2]In its Reply, SOC demands a heightened pleading requirement for Risinger to
21   plead alter ego liability.  Whether Rule 9(b) applies to pleadings of alter ego liability has
     been the subject of debate in district courts nationwide.  *See, e.g.*, *Pac. Gas & Elec. Co.*
22   *v. Jesse M. Lange Distrib., Inc.*, No. CIVS 05-1180-DFL-KJM, 2005 WL 3507968, at *1-2
     (E.D. Cal. Dec. 21, 2005) (refusing to impose heightened pleading requirement where
23   underlying allegations are not of fraud); *Ardente, Inc. v. Shanley*, No. C 07-4479 MHP,
     2010 WL 546485, at *4 (N.D. Cal. Feb. 10, 2010) (noting that heightened pleading
24   requirement inapplicable because alter ego liability is a doctrine, not a cause of action);
     *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003)
25   (imposing a heightened pleading standard, noting that "a plaintiff must allege specifically
     both of the elements of alter ego liability, as well as facts supporting each").  Risinger
26   has alleged that both SOC-SMG, Inc. and Day & Zimmerman, Inc. are co-owners and
     the moving forces behind SOC LLC, and properly put all three on notice of the
27   underlying claims.  In light of the case law above, and the adequacy of Risinger's
     pleading discussed below, the Court declines to impose a heightened pleading
28   requirement for the elements of an alter ego theory.

1   Defendants here are: SOC LLC is liable for violations arising out of the attached
2   employment agreement, and SOC-SMG, Inc. and Day & Zimmerman are liable to the
3   extent they operate as alter egos of SOC LLC.   SOC cannot manufacture confusion
4   where none exists.

5                    **2.      FRCP 9(b)**

6        SOC also argues that Risinger's FAC fails to meet Fed. R. Civ. P. 9(b)'s
7   heightened pleading standards for fraud claims. For the same reasons discussed above,
8   SOC's characterization that the FAC alleges a host of claims against undifferentiated
9   Defendants is erroneous. "Under Rule 9(b), claims alleging fraud are subject to a
10  heightened pleading requirement, which requires that a party state with particularity the
11  circumstances constituting fraud." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,
12  701 (9th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)). "Rule 9(b) demands that the
13  circumstances constituting the alleged fraud be specific enough to give defendants
14  notice of the particular misconduct so that they can defend against the charge and not
15  just deny that they have done anything wrong." *Sanford v. MemberWorks, Inc.*, 625 F.3d
16  550, 558 (9th Cir. 2010) (citations omitted).   Accordingly, "the complaint would need to
17  state the time, place, and specific content of the false representations as well as the
18  identities of the parties to the misrepresentation." *Id.* (citations omitted).

19       Here, Risinger adequately alleges the role of each entity defendant in the fraud.
20  He alleges that the fraudulent misrepresentations occurred during the time of his
21  recruitment, between February and March 2010.  (FAC at ¶¶ 13-16.)  He alleges these
22  misrepresentations occurred during his first solicitation (presumably in California), and
23  also in Nevada where he signed his contract.  (*Id.* at ¶¶ 14-16.)  He further alleges the
24  specific content of the false representations, including a host of employment guarantees
25  and promises that were not honored. (*Id.* at ¶¶ 17-18.)  Risinger alleges that SOC LLC's
26  shareholders, SOC-SMG, Inc. and Day & Zimmerman, Inc., instructed SOC LLC to
27  falsify employment records. (*Id.* at ¶ 18.)  Risinger even attaches as an exhibit a copy of
28  an allegedly falsified time sheet to the complaint. (*See* FAC, ex. B.)  To the extent that

Risinger's claims require a heightened pleading standard,[3] these allegations more than meet Rule 9(b)'s heightened pleading standards, and place SOC on notice of the charges against it.  As discussed below, Risinger's allegations state plausible claims for relief sufficient to withstand a motion to dismiss.

### 3.    Common Law Claims

Risinger alleges eight common law violations.  SOC seeks dismissal of these claims only on the basis of their insufficient pleading, and not on their applicability to Risinger's employment in Iraq.  The Court discusses each in the order raised by SOC's Motion.

### a.    Promissory Fraud (Count 1)

In order to recover on a promissory fraud claim, a plaintiff must allege its five essential elements: (1) the defendant made a false representation, (2) the defendant knew or believed that the representation was false, (3) the defendant intended to induce the plaintiff to act or to refrain from acting in reliance on the misrepresentation, (4) the plaintiff justifiably relied on the misrepresentation, and (5) the plaintiff suffered damages from the reliance. *Bulbman, Inc. v. Nev. Bell*, 825 P.2d 588, 592 (Nev. 1992).

As stated above, Risinger adequately pleads each element of his fraud claim with facts — not mere conclusions — to make out a plausible claim for recovery.  *See Iqbal*, 556 U.S. at 678.  Risinger alleges that SOC LLC, under the ownership of SOC-SMG, Inc. and Day & Zimmerman, Inc., entered into an employment agreement with him by making false representations about Risinger's future salary and work conditions. Risinger alleges that SOC knew these representations were false, but made them as

---

[3]SOC incorrectly seeks the imposition of a heightened pleading standard on all of Risinger's claims simply because his allegations of fraud are incorporated into each of his 18 counts.  But merely because Risinger pleads fraud in addition to violations of various common law torts and statutes does not morph a non-fraud tort into one that "sounds in fraud."  A heightened pleading standard is only required for fraud claims.  A violation of law mandating break periods or overtime pay, for example, does not require heightened pleading because it is not a fraud claim (i.e. no pleading of scienter is required).

part of its recruitment push for security guards and intended to rescind these guarantees once the guards were deployed to Iraq.  (*See* FAC at ¶¶ 16, 18, and 22-27.)  As a result, Risinger alleges an intent to act in reliance on these misrepresentations, i.e. recruiting future employees by promising various employment benefits and then withholding these benefits once the guards began their service.  Lastly, Risinger alleges damages in the form of withheld compensation and damages for work done in violation of the work conditions promised by SOC.  SOC's arguments to the contrary fail to appreciate the particularity with which Risinger brings his fraud claim.

### b.      Negligent Misrepresentation (Count 2)

The Nevada Supreme Court has adopted the following definition of negligent misrepresentation from the Restatement (Second) of Torts § 552:

> One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998).  Reliance is required to prevail on a claim for negligent misrepresentation.  *Bill Stremmel Mtrs. v. First Nat'l Bank*, 575 P.2d 938, 940 (Nev. 1978).  In light of Risinger's detailed allegations of intentional misrepresentation, the FAC states a plausible claim for relief for negligent misrepresentation.  At the very least, the allegations taken as true demonstrate that SOC failed to exercise reasonable care in communicating employment conditions and benefits to the security guards it hired.  Accordingly, Risinger's negligent misrepresentation claim proceeds.

### c.      Unjust Enrichment (Counts 3 and 8)

"The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor." *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187

(Nev. 1997).  "Unjust enrichment occurs when ever [sic] a person has and retains a benefit which in equity and good conscience belongs to another." *Id.* (quotations and citation omitted). "The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for]." *Id.* (*citing Lipshie v. Tracy Inv. Co.,* 93 Nev. 370, 379, 566 P.2d 819, 824 (1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.")).

Risinger pleads two counts of unjust enrichment, one on a contract-based theory and the other on a tort fraud theory.  He correctly argues that by virtue of his allegation that he worked above the agreed-upon hours set forth in his employment contract, he can state a quasi-contract claim and seek an award for unjust enrichment because the additional hours worked were not covered by an express contract. *See, e.g.*, *Buenaventura v. Champion Drywall, Inc.*, 803 F. Supp. 2d 1215, 1219 (D. Nev. 2011) (allowing unjust enrichment claim based on failure to provide adequate compensation); *McCullough v. Lennar Corp.*, No. 09-CV-1808-WQH-NLS, 2009 WL 3805305, at *6 (S.D. Cal. Nov. 10, 2009) (same); *United States ex. Falco Constr. Corp. v. Summit Gen. Contracting Corp.*, 760 F. Supp. 1004, 1011 (E.D.N.Y. 1991) (holding that subcontractor can recover in quasi-contract from contractor for work not encompassed in the agreement between the two). Risinger's unjust enrichment claim thus seeks an equitable return of value beyond the terms of his contract.[4]

### d.    Money Had and Received (Count 4)

Money had and received is a common law variation of an unjust enrichment claim that "can be maintained whenever one man has received or obtained the possession of

---

[4]While Risinger purportedly brings two unjust enrichment claims, his failure to demonstrate any meaningful difference between Counts 3 and 8 counsels in favor of treating the claims as one quasi-contract theory of recovery.

the money of another, which he ought in equity and good conscience to pay over." *Kondas v. Washoe County Bank,* 271 P. 465, 466 (Nev. 1928). This cause of action is duplicative of an unjust enrichment claim, and will be dismissed. *See Adams v. Cal. Dept. of Health Servs.*, 487 F.3d 684, 689 (9th Cir. 2007) (noting that two suits are duplicative where "the causes of action and relief sought, as well as the parties or privies to the action, are the same."). Indeed, it is not clear that this cause of action applies, since Risinger does not allege paying SOC any money to hold for Risinger's use. *See Schultz v. Harney*, 27 Cal. App. 4th 1611, 1623 (Cal. Ct. App. 1994) ("The [money had and received] cause of action is available where, as here, the plaintiff has paid money to the defendant pursuant to a contract which is void for illegality").

### e.      Breach of Contract (Count 5)

"A plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (citations and quotation marks omitted). Risinger alleges that SOC violated the terms of his employment agreement by not paying him $65,000 of guaranteed salary, failing to provide 42 days of paid vacation, and failing to limit work hours to 12 hours per day and 72 hours per week. (FAC at ¶ 113.) These allegations, taken as true, state a cause of action against SOC LLC as the contracting party, and SOC-SMG, Inc. and Day & Zimmerman, Inc. as alter egos. *See Bates v. Chronister*, 691 P.2d 865, 869 (Nev. 1984) (noting a nonparty who is an alter ego could function as a party to a contract for purposes of rescinding the contract).

SOC challenges Risinger's ability to sue for breach of the condition governing vacation days, arguing that the vacation day allotment was represented not in the employment agreement but in the offer letter that came with it. It is not clear, however, that the offer letter's terms do not make up part of the compensation package of Risinger's employment. It specifically provides: "The key elements of your compensation package include . . . 42 vacation days per year, which accrue in accordance with

Company policy, as may be amended from time to time."  (Dkt. no. 33, ex. A at A1.)
Even though the employment agreement purports to be an integrated agreement, the
language of the offer letter and its attachment to the employment contract raise sufficient
question as to the binding nature of the vacation condition.[5]   Accordingly, dismissal of
the contract claim is inappropriate where Risinger has properly pled its elements.

### f.   Breach of Implied Covenant of Good Faith and Fair Dealing (Count 6)

        "[A]ll contracts impose upon the parties an implied covenant of good faith and fair
dealing, which prohibits arbitrary or unfair acts by one party that work to the
disadvantage of the other."  *Nelson v. Heer*, 163 P.3d 420, 427 (2007).  "When one party
performs a contract in a manner that is unfaithful to the purpose of the contract and the
justified expectations of the other party are thus denied, damages may be awarded
against the party who does not act in good faith."  *Hilton Hotels Corp. v. Butch Lewis
Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991).  Even in the absence of a breach of
contract, a plaintiff may still recover damages for breach of the implied covenant of good
faith and fair dealing.  *Id.* at 922.  A party may recover either contract damages or a tort
damages on an implied covenant theory.  *See A.C. Shaw Const., Inc. v. Washoe County*,
784 P.2d 9, 10 (Nev. 1989) (discussing difference between contractual or tortious breach
of implied covenant of good faith and fair dealing).

        In order to maintain a tort-based claim for breach of an implied covenant, there
must be a special relationship between the tort-victim and the tortfeasor, especially
where the "the party in the superior or entrusted position has engaged in grievous and
perfidious misconduct."  *State, Univ. and Cmty. Coll. Sys. V. Sutton*, 103 P.3d 8, 19 (Nev.

---

        [5]This is true notwithstanding the ambiguous qualifying language included in both
the vacation terms and the salary terms. The vacation term provides for amendments to
the Company policy "from time to time," and the salary term ambiguously provides that
Risinger's compensation "shall be subject to review as required by the Company."  (*See*
dkt. no. 33, ex. A at A1, A3.)  The Court is unwilling to prevent discovery to determine
the import of this language.

2004) (internal quotations and citations omitted); *A.C. Shaw Const., Inc.*, 784 P.2d at 10 (special relationship required for tort-based claim but not for contract-based claim).

Here, Risinger appears to plead only a tortious breach of the implied covenant. Although the FAC is ambiguous as to which theory Risinger's wishes to proceed under, the parties briefed the matter assuming that the claim required a special relationship. SOC argues that Risinger failed to plead a special relationship, citing Nevada case law that refuses to declare all employment relationships automatically "special."   However, as SOC points out, breaches of employment relationships may under certain circumstances lead to tort liability under this theory.   *See, e.g.*, *Shoen v. Amerco, Inc.*, 896 P.2d 469, 475-76 (Nev. 1995) (holding that an employment relationship allegedly terminated with fraud and malice may open employer to tort liability "beyond the bounds of ordinary liability for breach of contract").

Here, Risinger alleges sufficient facts to plead a special relationship between SOC and himself. As Risinger points out in his Response, the nature of Risinger's recruitment and employment in Iraq creates a particular obligation for SOC to perform in good faith. SOC's employment offer to work as an armed guard protecting military installations in Iraq carries with it a special responsibility to inform its potential employees about the terms of their prospective employment and the details of workplace conditions, particularly where, as here, the position is overseas. The location of the position, its confidential nature, and the attendant safety and security hazards that come with accepting that position place SOC at a uniquely "superior or entrusted position" vis-à-vis its prospective hires.   And, perhaps most importantly, some of Risinger's allegations revolve around fraud and misrepresentation by SOC about employment conditions.   As in *Shoen*, the allegation of fraudulent intent in entering into the employment agreement transfers what might have been a garden variety contractual dispute into one that may give rise to tort liability.   *See Shoen*, 896 P.2d at 475-76.   Accordingly, the Court will not prevent Risinger from proceeding to discovery on this claim.

///

### g.     Quantum Meruit (Count 7)

The Nevada Supreme Court recently explained the contours of the often-confused quantum meruit claim.  Quantum meruit is pled in two distinct contexts: contract and restitution.  *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 256 (Nev. 2012). In the former, quantum meruit applies in actions based upon contracts implied-in-fact, which is found when "the parties intended to contract and promises were exchanged, the general obligations for which must be sufficiently clear." *Id.* In that circumstance, "a party may invoke quantum meruit as a gap-filler to supply the absent term." *Id.*  Risinger may proceed with this form of a quantum meruit claim to the extent that he can demonstrate that he and SOC intended to abide by various employment terms and benefits not memorialized between the parties.  Simply because Risinger has also pled the existence of a contract does not destroy the quantum meruit claim; he is entitled to demonstrate that the parties agreed upon various employment conditions missing in the express contract.  *See J.A. Jones Const. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1017 (Nev. 2004) (noting that plaintiff may plead both breach of contract claim and quantum meruit claim).

"Quantum meruit's other role is in providing restitution for unjust enrichment: 'Liability in restitution for the market value of goods or services is the remedy traditionally known as quantum meruit.'" *Certified Fire Prot. Inc.*, 283 P.3d at 256 (*quoting* Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011)).  This form of quantum meruit under serves as a *remedy* available after a finding of unjust enrichment. Here, Risinger will be able to seek quantum meruit as a remedy to the extent he can demonstrate unjust enrichment under his now-consolidated Counts 3 and 8.

SOC seeks dismissal of this claim on the grounds that it is insufficiently pled, and because Risinger continued his at-will employment subject to the changed terms he now challenges.  With respect to the first argument, Risinger adequately pleads enough facts to demonstrate that the terms of his employment agreement changed.  SOC complains that the "VBC Memo" — the document which Risinger alleges contradicted his

13

1  employment agreement (*see* FAC at ¶ 38) — was not attached to the FAC, and its author

2  not identified.  But attachment of the document, and identification of its author, is not

3  required.  Even if Risinger merely alleged that the terms of his employment changed

4  upon his arrival in Iraq without ever alleging the presence of a document that described

5  those changes, he would state a plausible set of claims against SOC.  That he chose to

6  provide *more* information than necessary to state a claim does not force him to provide

7  *all* information necessary to do so.

8  **4.    Nevada Statutory Claims (Counts 9 - 13)**

9  In addition to the common law claims, Risinger also brings five Nevada statutory

10  claims under the Nevada Wage and Hour Law ("NWHL"), NRS § 608.005, *et seq.*  The

11  NWHL, like the federal Fair Labor Standards Act, establishes various employment

12  regulations that Risinger alleges SOC's violated, including failure to pay overtime wages,

13  failure to provide meal periods, failure to provide rest periods, failure to timely pay

14  wages, and failure to maintain records of wages.  SOC seeks dismissal of these claims,

15  arguing that they do not apply here because Risinger's employment occurred outside of

16  Nevada.  SOC argues that these statutes are not intended to apply extraterritorially to

17  overseas employment, while Risinger counters that applying the NWHL would not give

18  the statutes extraterritorial effect but rather enforce the agreed upon terms of the parties.

19  Tasked with answering this thorny question of jurisdiction and conflict of laws, the Court

20  considered the parties' briefs and rules in favor of SOC.

21  **a.    Does the Conduct Arise Out of Nevada?**

22  The Court's threshold question in determining the applicability of the NWHL

23  statutes is whether the conduct can be said to have occurred within Nevada.  Based on

24  the facts alleged, the Court holds that Risinger's employment did not arise out of

25  Nevada. In making this determination, the Court finds the following facts relevant:

26  Risinger is a California resident; SOC LLC is a Delaware corporation with its principal

27  place of business in Nevada; SOC-SMG, Inc. is a Nevada corporation with its principal

28  place of business in Nevada; Day & Zimmerman, Inc. is a Maryland corporation with its

1   principal place of business in Pennsylvania; and outside of a brief training stint in

2   Nevada, SOC employed Risinger exclusively in Iraq.  The mere fact that two of the SOC

3   entities operate principally in Nevada does not make the alleged misconduct arise out of

4   Nevada. *See, e.g.*, *Glass v. Kemper Corp.,* 133 F.3d 999, 1000-01 (7th Cir. 1998)

5   (holding that Illinois wage law did not apply to nonresident employee who worked

6   outside the state, even though employer's primary place of business was in Illinois);

7   *Tidenberg v. Bidz.com, Inc.*, No. CV 08-5553 PSG (FMOx), 2009 WL 605249, at *4 (C.D.

8   Cal. March 4, 2009) (noting no specific facts linking defendant's contacts with California

9   to plaintiff's claims); *Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL 1159412,

10  at *2-4 (S.D. Ohio May 17, 2005) (ruling that an out-of-state plaintiff could not sue an

11  Ohio corporation for under Ohio's minimum wage laws for work performed exclusively

12  out of state). While Risinger does allege that the parties executed the employment

13  agreement in Nevada, and conducted some training in the state, these facts do not

14  morph the bulk of Risinger's employment in Iraq into work arising out of Nevada.  *See,*

15  *e.g*., *Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 657-58 (D.N.J. 2008)

16  (concluding that New Jersey's employment-discrimination law did not protect a non-

17  resident from discriminatory acts undertaken in Pennsylvania even though the employee

18  sometimes conducted business in New Jersey); *Sawyer v. Market America, Inc.*, 661

19  S.E.2d 750 (N.C. App. 2008) (holding that the fact an Oregon resident signed his

20  employment contract in North Carolina with a North Carolina employer was insufficient to

21  apply North Carolina wage law for work conducted outside of North Carolina).

22        Instructive is *Sarviss v. Gen. Dynamics Info. Tech., Inc.*, 663 F. Supp. 2d 883, 899

23  (C.D. Cal. 2009), which surveys California law on whether California employment laws

24  apply to various iterations of employees.  *Sarviss* involved a class challenge to a military

25  contractor's employment practices brought by a former helicopter pilot.  In *Sarviss*, the

26  court held that although the employee was a California resident, the fact that he

27  performed the "significant majority of his employment outside of California" rendered

28  California's wage and hour laws inapplicable to his work.  *Id.* Even though the defendant

1   in *Sarviss* was a Virginia corporation, the court held that the determinative issue is

2   whether the employee principally worked in California.  *See also Vendetti v. Compass*

3   *Environmental, Inc.*, No. 06 CV 3556, 2006 WL 3694852 (N.D. Ill. Dec.14, 2006) (holding

4   Illinois wage law only applied where at least some work was performed within the state).

5   Indeed, an unpublished California Court of Appeal case ruled against a plaintiff by

6   holding that even though the defendant was a California corporation, and prepared

7   payrolls and paychecks in California, the fact that the plaintiff's salaries or wages had a

8   significant nexus with jurisdictions other than California was enough to make them

9   extraterritorial. *Guy v. IASCO*, No. B168339, 2004 WL 1354300, at *4-5 (Cal. Ct. App.

10  June 17, 2004). In light of this case law, and the facts alleged, the Court holds that

11  Risinger's claims do not arise out of Nevada.

12       The question now becomes whether the NWHL apply to hold SOC liable for work

13  performed by Risinger outside of Nevada. The Court's analysis begins with the

14  recognition that "[u]nder choice-of-law principles, parties are permitted within broad limits

15  to choose the law that will determine the validity and effect of their contract." *Ferdie*

16  *Sievers & Lake Tahoe Land Co., Inc. v. Diversified Mortg. Investors*, 603 P.2d 270, 273

17  (Nev. 1979).  The employment agreement entered into by Risinger with SOC included

18  the following provision: "Governing Law. This Agreement shall be governed and

19  interpreted in accordance with the laws of the State of Nevada."  (FAC, ex. A at ¶ 8.)

20  This choice-of-law provision contemplates that the parties expected to be "governed by"

21  Nevada's law.  As there is no qualifying language, or apparent exceptions, to this term,

22  disputes arising from the agreement are to be adjudicated under the guise of Nevada

23  law.  *See Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir.

24  2003) (relying on *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 468-69 (1992) to

25  interpret "governed by" language and holding that disputes from agreement are to be

26  adjudicated under chosen law).

27       But contrary to Risinger's position, the mere presence of the choice of law clause

28  does not on its own obligate SOC to adhere to Nevada's employment laws.  "When a law

contains geographical limitations on its application, however, courts will not apply it to parties falling outside those limitations, even if the parties stipulate that the law should apply." *Gravquick A/S*, 323 F.3d at 1223.  The Ninth Circuit in *Gravquick*, consistent with the Fourth, Sixth, and Seventh circuits, held that a specific territorial limitation on the application of a state law must be given effect even where the parties contractually agree that the state law must apply.  *Id.*; *see Peugeot Motors of Am., Inc. v. E. Auto Distrib., Inc.*, 892 F.2d 355, 358 (4th Cir. 1989) (refusing to apply New York law to out-of-state franchisee's contractual dispute where the franchisee did not conduct business in New York, despite existence of New York choice-of-law clause); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 386 (7th Cir. 2003) (holding that geographic limitation in Illinois franchise law prevents its application to dispute with out-of-state franchisor notwithstanding express Illinois choice-of-law clause); *Bimel-Walroth Co. v. Raytheon Co.*, 796 F.2d 840, 842-43 (6th Cir. 1986) (interpreting geographic limitation in Wisconsin law to prevent its exterritorial application).  In *Gravquick*, the Ninth Circuit upheld the application of a California statute to a dispute arising out of a contract that designated California's as the governing law.  323 F.3d at 1223.  The court held that because the California statute did not contain an express geographical limitation, the parties could apply the statute through the choice-of-law clause in their contract.  *Id.*

For these reasons, the Court must determine whether Nevada Wage and Hour Laws contain express geographical limitations.  If they do, Risinger's claims must fail.

### b.    NWHL's Geographical Limitations

The legislative declaration that opens the NWHL states that the "Legislature hereby finds and declares that the health and welfare of workers and the employment of persons in private enterprise *in this State* are of concern to the State and that the health and welfare of persons required to earn their livings by their own endeavors require certain safeguards as to hours of service, working conditions and compensation therefor."  N.R.S. § 608.005 (emphasis added).  This statutory statement of purpose is consistent with the general presumption against the extraterritoriality of a state's statute.

1   *Judkins v. Saint Joseph's Coll. of Maine*, 483 F. Supp. 2d 60, 65 (D. Me. 2007); *see also*

2   *Sullivan v. Oracle Corp.,* 254 P.3d 237, 248 (Cal. 2011) (applying presumption to

3   California law); *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (recognizing

4   the presumption's applicability to federal statutes).

5          Similarly, the minimum wage provision of the NWHL instructs the state Labor

6   Commission to "establish by regulation the minimum wage which may be paid to

7   employees in private employment *within the State*."   N.R.S. § 608.205(1) (emphasis

8   added).  The overtime compensation subsection refers to NRS § 608.205, and expressly

9   excludes from its purview those employees not covered by § 608.205's minimum wage

10  provisions.  *See* NRS § 608.018(3)(a).  Since the minimum wage provision contains an

11  express geographical limitation, it cannot apply to those employees who work outside of

12  Nevada. This in turn precludes the overtime provision's application to extraterritorial

13  employees.

14         Several other NWHL provisions contain express geographic limitations, including

15  restrictions on certain types of payments through non-negotiable instruments and

16  prohibitions on certain assignments of wages and salaries. *See* NRS §§ 608.130,

17  608.170.  But Risinger does not bring suit on account of these regulations.  Although the

18  provisions he does sue under that cover meal and rest periods and recordkeeping have

19  no discernible textual limitation, they still cannot be applied extraterritorially in light of the

20  presumption against extraterritoriality. *See* NRS §§ 608.019 (governing periods for

21  meals and rest); 608.115 (governing records of wages).  Accordingly, these provisions

22  cannot be applied extraterritorially.

23         While the statement of the Legislature demonstrates an intent to limit the NWHL

24  to Nevada, Risinger argues that this intent applies only to employers in the State of

25  Nevada, not employees.  This reading fails the basic test of English grammar central to

26  proper statutory interpretation. The prepositional phrase "in this State" modifies the

27  nouns "health and welfare" and "employment" (both of which referring to "workers" and

28  "persons"), not the term "private enterprise."  *See* NRS § 608.005 (including the phrase

1  "the health and welfare of workers and the employment of persons in private enterprise

2  in this State").  Therefore, the statute governs all workers and persons — not employers

3  — who live or work "in this State."  Risinger argues that this conclusion conflicts with the

4  express applicability of NRS § 608.090(b), which governs adjustment of wages, to any

5  employee "stationed at a place other than at the place of regular payment of wages,

6  either within or without the State of Nevada." However, the inclusion of an express

7  extraterritorial term within one provision of the NWHL does not imply the extraterritoriality

8  of *all* NWHL provisions that remain silent on the issue; rather, the inclusion in NRS

9  § 608.090 is the only provision that excepts the general presumption against

10  extraterritoriality laid out in the NWHL's statement of purpose.

11        For these reasons, Risinger's attempts to bring NWHL claims against SOC fail.

12  Risinger's invocation of the *Infomax* decision is unavailing. *See Infomax Office Sys., Inc.*

13  *v. MBO Binder & Co. of Am.*, 976 F. Supp. 1247 (S.D. Iowa 1997).  In *Infomax*, the Court

14  held that a contractual choice-of-law clause incorporating Illinois law allows the

15  application of Illinois franchise law to the out-of-state parties to the contract, regardless

16  of the Illinois legislature's intent to limit or expand the franchise law's extraterritorial

17  reach.  *Id.* at 1253-54. The court ruled that the choice-of-law provision served "as a

18  short-hand means of incorporating numerous contractual terms" into their contract.  *Id.* at

19  1253.  The court reasoned that since parties are free to bind themselves to any agreed-

20  upon term, their choice-of-law clause incorporates by reference the relevant provisions

21  of Illinois law.   But the court made the mistake of assuming that a choice-of-law clause

22  incorporates by reference the entire body of Nevada law regardless of territorial

23  limitations. The contractual choice to be governed by Illinois law required an adjudicating

24  court to determine the rights, obligations, and boundaries of Illinois law.  If the law does

25  not vest a right onto a party in a particular situation (as when it refuses to be applied

26  extraterritorially), then the party cannot be heard to complain of its choice to be bound by

27  that law.

28  ///

Here, the parties contracted to resolve disputes under Nevada law. But as explained above, Nevada law does not protect Risinger in this situation; therefore, applying Nevada law to resolve this dispute does not help him.  The choice of selecting Nevada law to govern the contract requires the Court to determine Nevada law.  Risinger in effect asks this Court both to apply Nevada law *and* to change it to afford him (and other extraterritorial plaintiffs) relief.  This the Court cannot do.[6]  Accordingly, Risinger's Nevada statutory claims must be dismissed with prejudice.

### 5.    Iraqi Law Claims (Counts 14-17)

Risinger also brings various claims arising under the Iraqi Labor Code relating to allegations of unpaid overtime and denial of rest periods. After careful review of the briefings and the relevant case law, the Court decides against dismissal of these claims consistent with the reasoning below.

### a.    Choice-of-Law Clause

SOC first argues that Risinger cannot bring claims under the Iraqi Labor Code because the parties agreed to be bound by Nevada law. It points to the employment agreement's choice-of-law clause, and suggests that the clause precludes the application of the Iraq Labor Code.

"Under choice-of-law principles, parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract." *Ferdie Sievers & Lake Tahoe Land Co., Inc. v. Diversified Mortg. Investors*, 603 P.2d 270, 273 (Nev. 1979). "*Sievers* imposed two requirements for the validity of a choice of law provision: 'The situs fixed by the agreement . . . must have a substantial relation with the transaction, and the agreement must not be contrary to the public policy of the forum.'" *Pentax Corp. v. Boyd*, 904 P.2d 1024, 1026 (1995) (quoting *id.*).  In addition, the parties must have acted in

---

[6]Of course, Risinger and SOC were free not merely to choose the law that governs disputes arising out of their contract, but instead to incorporate actual substantive terms into their contract that mimicked various provisions of the Nevada Wage and Hour Law.  But their choice-of-law clause did not do so.

1    good faith and without an intent to evade the law of the state where the contract was

2    formed.  *Id.*  SOC argues that both requirements are met.  The Court disagrees.

3         For precisely the reasons that render this controversy extraterritorial, SOC cannot

4    demonstrate that Risinger's claims bear a substantial relation to Nevada. It is at best

5    merely related, and not *substantially* related: while SOC LLC and SOC-SMG, Inc.

6    operate principally in Nevada, and trained their employees for a few days in Nevada,

7    they were in the business of providing security services in Iraq, and did so by employing

8    a California resident. Risinger's claims arise out of alleged violations in Iraq, not Nevada.

9    One would be forgiven for viewing SOC's argument with incredulity. In one breath, SOC

10   — correctly, in the Court's view — asks that Nevada law not apply to Risinger's

11   employment because the controversy bears no connection to Nevada.  But, on the other

12   hand, SOC takes great pains to demonstrate the validity of the Nevada choice-of-law

13   clause precisely *because of* it operates in Nevada.  SOC cannot have the law both ways.

14                    **b.    Status of Forces Agreement**

15        SOC alternatively argues that the Status of Forces Agreement entered into

16   between the United States and Iraq ("the SOFA") bars the applicability of the Iraqi Labor

17   Code to American contractors and their employees. "It is not disputed that, as an

18   international executive agreement, [a] SOFA may be regarded as equivalent to a treaty

19   and therefore as federal law." *Dep't of Def. v. Fed. Labor Relations Auth.*, 685 F.2d 641,

20   648 (D.C. Cir. 1982) (*citing B. Altman & Co. v. United States*, 224 U.S. 583, 601 (1912)).

21   It is therefore well settled that a status of forces agreement supersedes any conflicting

22   statute or regulation.[7]  Whether Iraqi labor law applies to American contractors requires

23   an analysis of Iraqi law and its limits, as codified in the SOFA.

24        Article 10 of the SOFA provides that "United States Forces may select contractors

25   and enter into contracts *in accordance with United States law* for the purchase of

26   _____

27        [7]The parties do not dispute the United States-Iraq SOFA's characterization as a
     status of forces agreement, and the Court assumes that it carries the weight that a
28   bilateral treaty would.

materials and services in Iraq, including services of construction and building. . . . The United States Forces shall respect Iraqi law when contracting with Iraqi suppliers and contractors and shall provide Iraqi authorities with the names of Iraqi supplies and contractors, and the amounts of relevant contracts."  (*See* SOFA, dkt. no. 33, ex. E at A155 (emphasis added).)  This provision requires the application of United States law to contracting procedures, but not necessarily to disputes arising out of contract terms and performance among private parties.  (*Id.*)  Article 10 further provides that when United States Forces contract with Iraqi contractors, they "shall respect Iraqi law."  (*Id.*)  But the SOFA provides no comparable admonition to respect or adhere to Iraqi law when the United States contracts with non-Iraqi contractors.  SOC argues, therefore, that contracts with American entities like SOC LLC are governed "in accordance with United States law" in all respects, not merely to contracting procedures and contract formation.[8]

Risinger disputes this reading of the SOFA, arguing that Article 10 merely commands United States Forces to apply United States law in its creation of government contracts, i.e. using American law of contract formation to "enter into contracts." The Court agrees.  Article 10's heading of "Contracting Procedures" provides strong support for Risinger's position that American law only governs procuring contractors and drafting contracts.  Further, SOC's position runs counter to the express dictate of Article 12, which both SOC and its expert ignore.  Article 12 instructs its signatories that while "[t]he United States shall have the primary right to exercise jurisdiction over members of the United States Forces and of the civilian component for matters arising inside agreed facilities and areas," "Iraq shall have the primary right to exercise jurisdiction over United States contractors and United States contractor employees" in recognition of Iraq's "sovereign right to determine and enforce the rules of criminal and civil law in its territory

_____

[8]The Court notes that the SOFA applies only to private contractors who contract with the Department of Defense, as opposed to other United States entities.  (*See* Article 2 of SOFA at A50.)  As SOC contracted with the Department of Defense, there is no question of SOFA's applicability to SOC.

. . . ." (*See* SOFA, dkt. no. 33, ex. E at A156.)   Article 12 thus disaggregates United States Forces from United States contractors for the purpose of choice of law, except for the limited exception of "grave premeditated felonies" conducted by the military and its civil component.  (*Id.*)  This interpretation is consistent with media reports that described the negotiations between the two nations as being dominated by concerns over Iraq's jurisdiction to hold American servicepersons and private contractors accountable for criminal misconduct.[9]

Read together, Articles 10 and 12 command the application of Iraqi law to United States contractors and their employees, but the application of United States law to contract procedures, i.e., soliciting, procuring, and contracting with private contractors. Precluding the application of Iraqi law to United States contractors in Iraq would directly violate Article 12's acknowledgement of Iraq's sovereign right to enforce its laws. Accordingly, the SOFA requires United States contractors operating in Iraq to comply with Iraqi laws. *See, e.g.*, Anthony J. Colangelo, "*De Fact Sovereignty": Boumediene and Beyond*, 77 Geo. Wash. L. Rev. 623, 676 n.257 (2009) (discussing Article 12's limitations on United States jurisdiction in Iraq); *Iraqi Parliament Approves Status-of-Forces Agreement Setting Timetable for U.S. Withdrawal*, 103 Am. J. Int'l L. 132, 133-34 (2009) (noting Article 12 as "concerning" for some contractors for this reason).

SOC, with the assistance of their Rule 44.1 expert Professor Haider Hamoudi, challenge this conclusion.  First, SOC argues that the SOFA could not have reached this

---

[9] *See, e.g.*, Thom Shanker and Steven Lee Myers, *U.S. Makes Firmer Commitment to Pullout Date in Draft of Iraq Accord*, N.Y. Times (Oct. 17, 2008), *available at* http://www.nytimes.com/2008/10/18/washington/18military.html (noting that "American negotiators bowed to Iraqi anger over civilian deaths in shootings by private security contractors" leading to an agreement over Article 12's language); Saad Abedine and Mohammed Tawfeeq, *Iraqi Minister: Deal seeks to end security contractors' immunity*, CNN (July 1, 2008, 1:10 PM), http://edition.cnn.com/2008/WORLD/meast/07/01/iraq.main/index.html (describing contractor immunity as "sticking point" in SOFA negotiations); Erica Goode, *Negroponte Calls Security Deal on Iraq 'Close'*, N.Y. Times (Oct. 7, 2008), *available at* http://www.nytimes.com/2008/10/08/world/middleeast/08iraq.html (describing military and contractor immunity as "a central obstacle" in the negotiations).

result because Order 17 issued by the Coalition Provisional Authority ("CPA") immunizes contractors from Iraqi laws or regulations on matters relating to their contracts.[10]   *See* Paul L. Bremer, CPA Order 17 § 4, ¶ 2 (Revised), *available at* http://www.iraqcoalition.org/regulations/20040627_CPAORD_17_Status_of_Coalition__ Rev__with_Annex_A.pdf (last visited March 27, 2013).   But citation to CPA orders factors little in this Court's interpretation of SOFA, since the signatories intended the agreement to revise the jurisdictional scope of Iraqi law vis-à-vis the American military, State Department, and their respective contractors, as detailed in the reports cited above.[11]   To the extent that SOFA provides for a different legal landscape for American contractors, its provisions appear to supersede previously adopted Iraqi law in the form of Order 1 — a point that SOC makes in its Motion.  (*See* dkt. no. 32 at 42.)

SOC also challenges the applicability of Iraqi law to private contractors on the basis of a so-called "doomsday scenario." SOC argues that applying Iraqi labor law to SOC renders illegal all American contracting activity in Iraq, since, according to Professor Hamoudi, the Iraqi Labor Code required all employees to obtain an Iraqi labor permit.  (*See* Hamoudi Decl., dkt. no. 33, ex. D at ¶ 16.)  As no contractor or contractor's employee was required to obtain an Iraqi labor permit, SOC argues that it cannot be that

---

[10]The United States, with the help of its allies, established the Coalition Provisional Authority as a transitional government in the wake of its invasion of Iraq. *See McGee v. Arkel Int'l, LLC*, 671 F.3d 539, 542 (5th Cir. 2012).  It was dissolved on June 30, 2004.  *Id.*  The CPA issued a number of orders, which had the force of law, in its authority as the interim Iraqi government until June 2004.  *See* Paul L. Bremer, CPA Regulation Number 1, § 3, ¶ 1, *available at* http://www.iraqcoalition.org/regulations/ 20030516_CPAREG_1_The_Coalition_Provisional_Authority_.pdf (last visited March 29, 2013) (describing CPA orders as "binding instructions" that "take precedence over all other laws and publications"); *CPA Official Documents*, http://www.iraqcoalition.org/ regulations/ (last visited March 29, 2013) (describing CPA orders as "binding instructions or directives to the Iraqi people that create penal consequences or have a direct bearing on the way Iraqis are regulated, including changes to Iraqi law").

[11]Upon the dissolution of the transitional government, the CPA issued Order 100. Order 100 intended to provide the framework for the transition of power away from the CPA, and provided that CPA orders remain in force unless rescinded or amended by legislation.   CPA Order 100 (available at http://www.iraqcoalition.org/regulations/ 20040628_CPAORD_100_Transition_of_Laws__Regulations__Orders__and_Directives .pdf); *McGee*, 671 F.3d at 543.

Iraqi law requires such a permit; otherwise, all American contracting activity would be illegal.  The Court disagrees.  That contracting activity in Iraq is not illegal under Iraqi law suggests exactly the opposite conclusion that SOC reaches, namely that SOFA precluded the application of any Iraqi permitting requirement on American contractors. The simple fact that the SOFA was enacted as a mechanism for maintaining an American presence in Iraq (both military and private) raises a presumption that the comprehensive scheme it creates supersedes any applicable Iraqi labor requirements that might hinder such a presence.[12]  *Cf. English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (discussing field preemption in the context of Congressional preemption of state law).

This interpretation is the only plausible way to read the SOFA without writing out of existence Article 12.  As mentioned above, Article 12 expressly provides for Iraqi jurisdiction over American contractors.  Inexplicably, neither SOC's briefings nor Professor Hamoudi's expert declaration make any mention of Article 12, even though it appears to be the most relevant provision in SOFA to this dispute.  Indeed, as described above, the parties to SOFA through Article 12 recognized "Iraq's sovereign right to determine and enforce the rules of criminal and civil law in its territory" and "the duty of the members of the United States Forces and the civilian component to respect Iraqi laws, customs, traditions, and conventions."  (SOFA at § 12.)  A sampling of available research on the topic confirms the Court's conclusion.[13]

_____

[12]The Court notes that while SOFA regulates the legality of an American presence in Iraq, it does not concern the specific terms and conditions upon which employers may employ individuals in Iraq.  As such, SOFA leaves open the application of other applicable Iraqi employment regulations, including any that may cover wage guarantees, overtime, rest periods, and the like.

[13]*See* Jennifer K. Elsea, Cong. Research Serv., R40991, *Private Security Contractors in Iraq and Afghanistan: Legal Issues* 12-13 (2010) *available at* http://www.fas.org/sgp/crs/natsec/R40991.pdf (concluding that Iraqi law applies to American contractors);  Robert Nichols, *New U.S.-Iraq SOFA Lifts Contractor Immunity*, 5 Int'l Gov't Contractor 12 (2008) *available at* http://www.crowell.com/documents/New-US-Iraq-SOFA-Lifts-Contractor-Immunity.pdf (same); David Kasanow, *New Legal (fn. cont…)*

1    This interpretation of the SOFA is in line with federal regulations that require
2  contractors to comply with labor laws of the host country unless a SOFA confers special
3  status to them. *See* 48 C.F.R. § 252.222-7002(a) (requiring defense contractors to
4  comply with all local labor laws). The SOFA applicable here does not confer any special
5  status on SOC that abrogates obligations to comply with Iraqi law. Whatever the
6  consequences of this interpretation of SOFA may have on private contracting in Iraq is a
7  result of the unambiguous language of SOFA. The significant changes brought upon the
8  legal landscape for contractors after the execution of the SOFA were intended to
9  restructure the relationship between the United States military, American contractors,
10  and Iraqi law — a result that cannot be fairly called a "doomsday scenario."

11                      **c.     Application of Iraqi Law**

12    The Court's conclusion that Iraqi law applies to Risinger's claim necessitates
13  additional briefing from the parties as to the availability of relief to Risinger under Iraq's
14  labor code. Only SOC provided a Rule 44.1 expert to assist in the Court's application of
15  Iraqi law, which Risinger raised various objections to. (*See* dkt. no. 45.) The parties are
16  instructed to provide supplemental briefing on the viability of Risinger's Iraqi causes of
17  action consistent with the decision above, with particular attention to the availability of
18  class relief, the relevance of Iraqi court's exclusive jurisdiction over labor disputes for this
19  Court sitting in diversity, the availability of relief to an employee who has not complied
20  with any labor permitting requirement, and any other relevant considerations. Both
21  parties' supplemental brief is due within 30 days of the entry of this Order, and shall be
22  limited to 15 pages in length, not including any Rule 44.1 declarations or additional
23  exhibits. The Court will consider the briefings and schedule argument if necessary.

24  ///

25  ///

26

27  *(…fn. cont.)*
  *Framework Puts Contractors Under Iraqi Jurisdiction* (Dec. 9, 2008), McKenna Long &
28  Aldridge, LLP, http://www.mckennalong.com/publications-advisories-2042.html.

### 6.    Fair Labor Standards Act Claim (Count 18)

Risinger's last claim for relief is brought for unpaid overtime wages in violation of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207.  As the FLSA does not apply to work performed outside the United States, this claim must be dismissed.

The FLSA contains an express provision precluding the application of sections 206 (minimum wage), and 207 (maximum hours) to work performed in a foreign workplace or territory under jurisdiction of the United States, with some limited but inapplicable exceptions.  29 U.S.C. § 213(f).  Prior to the enactment of the FLSA foreign workplace exemption, the FLSA applied to employment on military installations overseas.  *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 390 (1948).  In *Vermilya-Brown,* the Supreme Court upheld the application of the FLSA to contractors employed at a military installation in Bermuda.  *Id.*  The Court reasoned that Bermuda, like Puerto Rico, Guam, Samoan Islands, Virgin Islands and the Canal Zone, is a territory possessed and controlled by the United States in a way that makes labor regulations vital to the nation's interests.  *Id.* at 389-90.

Concerned that paying foreign workers wages in excess of local standards would disrupt local labor economies, Congress responded to *Vermilya-Brown* by passing § 213(f).  *See* Anne Thibadeau, *Pennsylvania Employees Protected Abroad: Extraterritorial Application of State Labor Law in Truman v. DeWolf, Bobert & Associate, Inc. and the Fair Labor Standards Act Foreign Work Exemption*, 73 U. Pitt. L. Rev. 193, 195 (2011). Senate reports also reflect the concern that application of the FLSA to military contractors would expose them to liability that the Department of Defense insured against.  *Id.* at 195-196.  Application of the FLSA in this action would directly undermine the purpose of the foreign workplace exemptions.  Accordingly, the FLSA cannot extend to SOC's employees working on military installations in Iraq.  *See Taha v. L3 Commc'ns Corp.*, 1:09CV720 (JCC), 2009 WL 3837278, at *3 (E.D. Va. Nov. 13, 2009) (granting motion to dismiss FLSA claims because FLSA did not apply to military

///

1  contractor employees in Iraq); *Oxford v. Linc Group, Inc.*, 724 F. Supp. 2d 570, 573

2  (E.D.N.C. 2010) (same).

3  **V.    CONCLUSION**

4         Accordingly, IT IS HEREBY ORDERED that SOC's Motion to Dismiss (dkt. no.

5  32) is GRANTED in part and DENIED in part.   The parties are instructed to provide

6  supplemental briefing within 30 days of the date of this Order.   The briefing is limited to

7  fifteen (15) pages on the availability of relief under Iraqi law for the allegations set out in

8  Risinger's Complaint.

9         IT IS FURTHER ORDERED that SOC's Motion to Seal (dkt. no. 31) is GRANTED

10  in part and DENIED in part.   SOC is to file a redacted copy of the Motion to Dismiss and

11  its appendix for public release, redacting the documents consistent with the instructions

12  in this Order.

13        DATED THIS 29th day of March 2013.

14

15

16                                    MIRANDA M. DU
                                      UNITED STATES DISTRICT JUDGE
17

18

19

20

21

22

23

24

25

26

27

28