# APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| KARL E. RISINGER, an individual, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 2:12-cv-00063-LRH-PAL |
| v. | ) ) ) | |
| SOC LLC, a Delaware limited liability company registered and doing business in Nevada as SOC NEVADA LLC; SOC-SMG, INC., a Nevada corporation; DAY & ZIMMERMAN, INC., a Maryland corporation; and DOES 1-20, inclusive, | ) ) ) ) ) ) ) | |
| Defendants. | | |

**SUPPLEMENTAL DECLARATION OF HAIDER ALA HAMOUDI**

1. My name is Haider Ala Hamoudi. I submit this declaration as a supplement to my earlier declaration filed with the Court. (Hamoudi Decl. dkt. no. 33. Ex. D).

2. This supplemental declaration expounds on particular aspects of the Iraq Labor Law, No. 71 of 1987 (the "Labor Code"), as they may be relevant to this dispute.

3. In connection with delivering this supplemental declaration, I have reviewed, in addition to Plaintiff's First Amended Complaint, dated March 8, 2012, the following laws and regulations in their original Arabic, unless otherwise noted below:

    a. The Constitution of the Republic of Iraq, ratified by referendum held on October 15, 2005.

    b. The Iraqi Labor Code, No. 71 of 1987 (the "Labor Code").

1

c. The translation of the Iraq Labor Code (the "Labor Code Translation"), submitted by Plaintiff in Plaintiff's Appendix in Support of Memorandum of Points and Authorities in Opposition to Defendants' to Dismiss, filed May 11, 2012 ("Plaintiff's Appendix Filing").

d. Ministry of Labor and Social Affairs Regulations, No. 5 of 1985 (the "RCC Decree Regulations"), issued pursuant to Revolutionary Command Council Decree, No. 1097 of 1985.

e. Ministry of Labor and Social Affairs Regulations, No. 18 of 1987 (the "18/1987 Regulations"), issued pursuant to the Labor Code.

f. Ministry of Labor and Social Affairs Regulations, No. 6 of 1988, issued pursuant to the Labor Code.

g. Ministry of Labor and Social Affairs Regulations, No. 4 of 1989, amending the 18/1987 Regulations (together with the 18/1987 Regulations, the "Foreign Worker Regulations").

h. Revolutionary Command Council Decree, No. 1097 of 1985, respecting the hiring of workers in foreign companies.

i. Status of Forces Agreement Concluded Between the United States and the Republic of Iraq, dated Nov. 17, 2008 (the "SOFA").

j. The Civil Code, No. 40 of 1951.

k. The Civil Procedure Code, No. 83 of 1969.

l. The Criminal Procedure Code, No. 23 of 1971.

m. The Investment Law, No. 13 of 2006.

n. The Law of Night Guards, No. 8 of 2000.

      **o.** The Personal Status Code, No. 188 of 1959.

      **p.** Treaty Regulating the Hiring of Egyptian Labor, between the Republic of Iraq and the Republic of Egypt, ratified July 7, 1988 and enacted into Iraqi law as Law No. 116 of 1988 on October 3, 1988.

4. I have also reviewed a leading commentary of Iraq's Labor Code, a work entitled *The Labor Code* (the "Labor Code Commentary"), whose second printing appeared in 2010 and which was written by Drs. Adnan Al-Abid and Yusuf Elias. Secondarily, I have reviewed the premier commentary of the Iraq Civil Procedure Code, written by Chief Justice Medhat al-Mahmoud and published in its fourth printing in 2011.

5. Finally, I have reviewed relevant Iraqi case law concerning labor law, specifically as published in a book entitled *Labor Decisions: In Accordance with Judicial Principles Settled upon by the Federal Court of Cassation* (the "Labor Case Compilation"). The book is written by Judge Shihab Ahmed Yaseen and attorney Khalil Ibrahim al-Mashahadi and its second printing appeared in 2011. It is widely available in Baghdad's major bookstores. It contains a thorough compilation of hundreds of appellate decisions from labor courts throughout Iraq from the years 2000-2008 exempting only 2003, the year that the Saddam regime was removed from power and the labor courts, along with most of the rest of Iraq's courts, were not fully operational.

6. As was indicated in my original declaration, I am fluent in the Arabic language and have written, lectured and taught various aspects of Iraqi law for nearly a decade. (Hamoudi Decl. ¶¶1-8). Accordingly, the translations of primary materials referred to above and cited herein are my own.

**An Overview of Iraq's Civil Law System**

7. The Iraqi legal system is a civil law system.  This has several quite important ramifications that require mention.

8. Common law and civil law diverges dramatically with respect to the importance afforded to judicial decisions.  There is no notion of binding judicial precedent, and courts generally do not cite to the decisions of other courts in reaching their determinations in a civil system.  Even a cursory review of the Labor Case Compilation reveals that citations to other cases is extremely rare, if not entirely absent. In fact, most Iraqi law students have not read a single case prior to their graduation.

9. Rather, the commentaries of legal experts in the law, such as the Labor Code Commentary, are deemed far more authoritative.

10. In addition, common law statutes differ from codes in a civil law system important ways.  Whereas a statute in a common law system is effectively layered on top of the existing legal structure, composed of legislation and judicial precedents, a code in a civil law system such as the Labor Code is designed to be comprehensive, with interlocking provisions, consistent definitions and a thorough internal logic that sets forth the corpus of the substantive rules that govern a particular area of law.

11. Hence, a code in a civil law system such as Iraq generally displaces existing law.  Accordingly, the Labor Code expressly repeals the previously existing Labor Code, nine separate individual laws on labor (issued in the form of Revolutionary Command Council decrees) and five separate sets of rules and regulations concerning labor matters (Labor Code, Art. 162).

4

12. Subsequent legislation usually takes the form of an amendment to the Labor Code, so that the Labor Code can retain this comprehensive nature and remain the source of the substantive rules concerning labor.

13. Substantive codes in a civil law system therefore set forth a comprehensive and all encompassing scheme that is meant to cover all matters relating to a particular legal subject matter, with very limited exceptions. As for the procedural means by which an Iraqi court conducts itself, this is handled through reference to two equally comprehensive procedural codes—the Civil Procedure Code and the Criminal Procedure Code, which deal with civil and criminal cases, respectively.

**High Levels of State Control over Management of Labor Relations**

14. The Labor Code was enacted in 1987, at a time when Iraq was a socialist state in which the public sector dominated the economy.

15. Though Iraq has made modest efforts to reform its laws to encourage some level of private sector growth, in particular through revisions of its Companies Law and the enactment of a Foreign Investment Law, important parts of Iraq's legal infrastructure remain deeply influenced by its socialist past. This is certainly the case for the Labor Code.

16. The decision of the Iraqi legislature to continue in force the Labor Code even as other laws have been enacted or significantly amended to spur private development and growth demonstrates its desire to adhere to particular socialist principles as they have been advanced within the Labor Code.

17. Premier among these is the prominent role of the state in managing labor relations. This is
demonstrated in the first article of the Labor Code, which reads as follows:

> The purpose of this code is to deploy labor to serve in the process of building a national
> economy, for the purpose of prosperity and the improvement of living conditions.
> (Labor Code, Art. 1.)

18. The language is notable. The Labor Code, which is the source for nearly all substantive rules
of labor and which lays out a comprehensive and organized scheme for organizing labor
relations, describes its primary purpose in developing the scheme as a means to use labor to
plan a national economy.

19. Labor and management relations, that is, as organized under the rules of the Labor Code,
must be understood to be but one aspect of state economic planning. Provisions respecting
minimum levels of rights for workers, and the prevention of exploitation of workers, may be
present in the Code, but as goals, they are secondary to the premier purpose of state
economic planning.

20. Abid and Elias expound on this concept further.

> The Labor Code appears at first glance as if it is a branch of private law, and that is
> because it organizes the relations between individuals; namely, the workers and their
> employers. Hence its subject matter is the same as the rest of the branches of private law,
> such as the Civil Code and the Commercial Code. Yet despite the fact that the bases of
> the Labor Code organize relations between individuals, these bases depart from the limits
> of the recognized principles of the private law. They transfer it to the realm of public
> law, *because of the interference of the state in the organizing of the relations of labor,*
> given that [the state] has the power to command. (Abid and Elias, p. 31) (emphasis
> added).

**Restrictions on Collective Disputes**

21. With this background, it becomes clear that the substantive rules of the Labor Code
respecting the management of "collective disputes" are not merely administrative or
bureaucratic niceties, or rules of specifically Iraqi procedure. Rather, they are part of the

6

overall comprehensive scheme of the Labor Code, specifically designed to fulfill its

overriding goal, which is to use labor relations to manage the national economy.

22. More specifically, in light of the damage to an economy that can be done by labor disputes

that extend beyond individual claims, the Iraqi Labor Code gives such disputes a special

status and establishes substantive requirements that must be satisfied before a group action

can proceed.

23. Hence, Article 130 defines "labor strife" broadly:

> Labor strife means collective disputes that affect the common interests of workers that
> arise between them and employers in one or more enterprises, or one or more professions
> or industries, over what may arise in the implementation of the Labor Code or its
> regulations, or its individual contracts, in the form of conflicting perspectives. These
> disputes are characterized as labor strife, if a solution to them on amicable terms as
> between the two groups in strife is unreachable.

24. Abid and Elias expound as follows:

> For a dispute to be collective, two conditions must be fulfilled. The first concerns the
> parties to the dispute, and the second concerns its subject. Hence it is considered
> collective when one of the parties is a group of workers, and when this dispute slices
> across a common interest to the workers. And the first condition is met when the
> workers' side is in the situation of a group, and it is not necessary that it be a union, while
> the other side may be a single employer.

> As for the second condition, it is realized when the subject of the dispute has an effect on
> a common interest of the workers.

25. Hence, any time that there is a group of workers who are involved in a dispute with an

employer over a common interest, the specific "labor strife" provisions of the Labor Code are

put into force.

26. As my previous declaration indicates in detail, these specific and detailed provisions are

designed to resolve the dispute in a manner that presumes deep involvement by the state and

outside actors, including in particular the Ministry of Labor and Social Affairs, trade unions

representatives where relevant, and the head of the General Confederation of Trade Unions.

7

It authorizes the state through the Ministry, as well as the General Confederation of Trade Unions, to take the lead in resolving the dispute. If unresolved, the matter then proceeds immediately to a special panel of the highest court of general appeal in all of Iraq, the Federal Court of Cassation, rather than working its way up through a lower court. (Hamoudi Decl. ¶¶22-29)

27. To reiterate, these rules are not a mere matter of process. As a civilian code, the Labor Code in fact is not intended to be procedural at all, but rather to lay out a careful, integrated and comprehensive means to achieve its fundamental goal of planning and managing a national economy. These provisions do this by giving the state a major role in ensuring that disputes of any sort that involve large groups of workers with a common interest are resolved quickly and without disruption to the national economy.

**Jurisdiction of Labor Courts/Statute of Limitations.**

28. My previous declaration indicated that jurisdiction for the resolution of labor disputes lies in labor courts as they are to be set up in each governorate according to Article 137 of the Labor Code. The Labor Code does not have special provisions for foreigners respecting forum, as other Iraqi laws do. (Hamoudi Decl. ¶33).

29. It should also be noted that Article 138 sets up a special appeals panel within the Court of Cassation, thereby rendering the entire labor resolution process, from trial through appeal, insulated from the general judiciary.

30. Labor claims are also to be regarded as urgent ones, to be resolved on an expedited basis as per Article 140 of the Labor Code.

31. The most obvious reason for mandating urgency in labor claims, and indeed the most obvious reason for the balance of the policies respecting the vesting of jurisdiction in a

separate court, is revealed once again by reference to Article 1. The state has developed a

comprehensive and coordinated scheme in the Labor Code that is designed to deploy labor in

a manner that will build a national economy, and the state has viewed the swift and decisive

resolution of disputes in a separate court system to be an integral part of that.

32. This very same policy is realized in Article 145 through a strict, three year statute of

limitations which begins when the denied right of the worker is actually earned. Abid and

Elias explain as follows:

> The running of this statute of limitations begins on the date that the right was obligated to
> be given, and it is subject to the same rules as to suspension or termination set forth in the
> Civil Code.
>
> The continuation of a relationship between the parties to the contract does not prevent the
> initiation of the running of the statute of limitations. The text of the law is clear that this
> statute is deemed to run from the date (the right) is earned, and not from the date of the
> end of the contract. (Abid and Elias p. 348).

33. This statute of limitations is comparatively short by Iraqi standards. Hence, for example,

Article 430 of the Iraqi Civil Code grants a five year statute of limitations as to "every

periodic right that arises anew" such as payments of interest and salaries. The short

limitations period for labor claims is yet another indication of the strong desire of Iraqi

lawmakers to ensure that labor disputes of any sort are not permitted to fester, so as not to

interfere with the overriding goal of building a national economy.

34. As concerns trial *process,* separate and apart from the Labor Code's detailed scheme of

national economy building, the Labor Code has only one provision, which is Article 146.

That provision reads as follows:

> The rules of the Civil Procedure Code and the Criminal Procedure Code, each in its
> respective place, shall apply to the extent that it does not *refute* any specific provision of
> this law. (Emphasis supplied).

35. The language again is notable, in particular the use of the verb *radda,* which I have translated as "refute," but which can also be translated as "throw back, repel, drive back, or drive away." Commonly, the verb used to describe a conflict between one legal provision and another is *ta'aradha,* or "contradict". Hence, Article 2 of the Iraq Constitution voids laws that "contradict" the principles of democracy, among other things, Article 33 of the Investment Law, No. 13 of 2006, voids any legal provisions that "contradict" the Investment Law, and Article 92 of the Personal Status Code, No. 188 of 1959, does the same as for the Personal Status Code, again using the verb "contradict."

36. The less common use of the verb *radda* in this context implies that a potential conflict not only contradicts the Labor Code, but would have the effect of "driving back" a particular, thorough integrated scheme that the Labor Code had developed to manage labor relations in a way that would integrate the national economy.

37. Hence, where the procedural codes are truly a matter of organizing a litigation *process*, they are used, because they have their own careful and calibrated scheme as to matters of procedure. Yet where they would "drive back" or "repel" the Labor Code's integrated and interlocking structure for organizing labor so as to plan a national economy, they are not applied to the extent of the conflict.

**Security Guard Exemptions under the Labor Code**

38. Article 56 of the Labor Code addresses the circumstances of a worker whose work is intermittent over the course of the day, or spread over two work periods in a single day, such as a schoolteacher who would not necessarily be working the entire time he was at the school. Such workers may not be kept at their place of work under the Labor Code for more than twelve hours, and may not work for more than eight of those hours.

39. Articles 62 and 63 provide circumstances where an employer may demand overtime, and pay overtime pay, but these are limited. The general rule is that a worker is not permitted to work more than eight hours a day, even if they are paid overtime.

40. In my original declaration, I indicated that Article 66(2)(b) exempts from the provisions of Article 56 "those working as security guards." This is the most accurate translation of that provision.

41. The precise two operative words used in Article 66(2)(b) are "*mushtaghilin*" which comes from the root *shaghala* and means, in this context, "to be engaged in" or to "work." The other term is *hirasa,* which comes from the root *harasa,* and it means to "guard." In its noun form, *haris,* it refers to guards of all sorts, from those watching over things to bodyguards. The Royal Guard, responsible for protecting the king during the monarchy, used the same root term in Arabic, as did the Republican Guard during the Ba'ath era. Nobody would have thought to translate either of those as "Royal Watchkeepers" or "Republican Watchkeepers."

42. Hence, the term certainly is not limited to "watchkeeping" as suggested by the Labor Code Translation. In fact, when Iraqi lawmakers wanted to address the specific matter of guards responsible for protecting particular places and things, they were quite able to do so using more restrictive terminology.

43. An example is Law 8 of 2000, known as the Law of Night Guards. It was recently amended by an as yet unnumbered 2013 law and it provides a definition of "night guards" in Article 1, as amended, which reads as follows:

> The Ministry of the Interior or his authorized representative, in cooperation with the head of the relevant administrative unit, may commission the responsibility for guarding residential, trade, industrial and other places to one or persons called a "night guard".

11

44. The term for "guard" is the same as that used above, from the root *harasa*. These individuals, by virtue of their tasks, appear to fit the definition of "watchkeepers" somewhat more closely. But the fact that the drafters found it important to qualify the word "guard" with the term "night," even though Article 1 makes no mention of their necessarily being employed solely at night, demonstrates the breadth of the term "guard" when used without such a qualifier, as it is in Article 66(2)(b) of the Labor Code.

45. Regulation 6 of 1988, issued by the Ministry of Labor and Social Affairs confirms that those working in the field of "guarding" are exempt from the rules of Article 56. Instead, an employer may hire a security guard under Regulation 6 to work for up to twelve hours a day, so long as any time over eight hours a day is counted as overtime, with the rate of such overtime pay calculated in accordance with the Labor Code. (Regulation 6, Arts. 2-3). An employer's requirement to pay overtime can be satisfied by a lump sum payment regime contemplated by Article 45 as set forth more fully below.

46. The same regulation also permits the parties to contract such that there are no rest periods during the day as called for in the Labor Code. (Regulation 6, Art. 4).

**Freedom to Contract to Set Means of Paying Wages under the Labor Code**

47. Despite the broad government intervention into matters concerning labor as set forth in the Labor Code, the Code does grant to the parties to a labor contract relatively broad freedom to set the amount of wages and the method of paying them.

48. Hence, Article 47 prohibits only labor contracts that would pay a worker less than the established minimum wage for an unskilled worker. Provided the worker is compensated at a level that exceeds this minimum limit, the Labor Code leaves the wage agreed upon as between employer and employee to their judgment and agreement.

12

49. Likewise, Article 45 reads as follows:

> The setting of the wages may be on the basis of a lump sum or in accordance with any other regime that sets the value of the wage based on the production of the worker, so long as it does not fall below the minimum wage of an unskilled worker.

50. Hence, rather than pay a worker an hourly wage, an employer is free to pay the worker, for example, a lump sum for any given item produced or period of production.

51. Similarly, an employer for security guards, aware that she will need a given security guard to be regularly working beyond the eight hours a day that constitutes regular hours under the Labor Code, may contract with that security guard either to pay him a daily lump sum wage that incorporates the overtime that she expects him to work on a regular basis or even an annual salary that accomplishes the same result.  On the other hand, a different employer who believes he will need his security guards to work overtime only sporadically may contract with his security guards to pay them a lesser amount for a maximum of 40 hours a week, but this employer would also agree to pay them in the contract the overtime amounts set forth in Labor Code for any additional hours worked.  Either contract is permitted under the terms of Article 45 of the Labor Code.

52. Again, the *only* limitation under the Labor Code for any such contract is that the amount ultimately given to the worker must at least match the minimum hourly wage of an unskilled worker.

53. The government set the minimum wage for unskilled workers in the private sector at 120,000 Iraqi Dinars, or approximately $95, per month, by Council of Ministries Decree No. 409 of 2008.  The government announced on its own website on May 17, 2009 that it was raising the minimum wage for unskilled workers in the public and mixed sectors to match this. Estimating a work month of approximately 24 days a month (by removing 4 weekly days of

rest and 2 days for national holidays), this amounts to 5000 dinars, or $3.93, per full day

worked, leading to an hourly wage calculation of $0.49/hour for an eight hour day.

**Licensing of Workers**

54. Under the Labor Code, one important facet of the state's building a national economy is to

*guarantee* employment to any Iraqi citizen who is able to perform it. This guarantee

specifically appears in Article 2 of the Labor Code.

55. Indeed, Abid and Elias connect much of the government involvement in labor relations that

is set forth in the integrated scheme of the Labor Code to the employment guarantee. Hence,

they indicate the following at the start of a lengthy chapter on the nature of government

interference into employer and employee relations:

> The state interferes in the social organization of work and it aims in its interference to
> guarantee employment and provide it to workers desirous of it, on the grounds that it is a
> right that the state is obligated to provide to each citizen capable of it under equal
> conditions and opportunities for all. . . . (Abid and Elias, p. 67).

56. The restrictions on foreign workers present in the Labor Code and the Foreign Worker

Regulations, described in my previous opinion, are consistent with the state's intention to

manage labor rules so as to build the national economy and guarantee full employment for

every Iraqi.

57. Hence, the Foreign Worker Regulations only provide limited exemptions from their

provisions, covering non-Iraqis working in embassies, for example, who would never be

deemed to be subject to the Iraq Labor Code. In addition, Article 11(1) of the regulations

reads as follows:

> Exempted from the provisions of these regulations are . . . (b) foreigners, where laws,
> treaties and international covenants to which Iraq is a party permit them to engage in
> work in Iraq.

14

58. This exemption was meant to address the fact that Iraq had significant numbers of foreign workers at the time that the Foreign Worker Regulations were developed, particularly from Egypt and the Sudan, and they were often employed pursuant to specific processes set forth in treaties with their respective countries of origin. The hiring processes set forth in those treaties are significant and onerous. *See, e.g.,* Treaty Regulating the Hiring of Egyptian Labor, between the Republic of Iraq and the Republic of Egypt, ratified July 7, 1988 and enacted into Iraqi law as Law 116 of 1988 on October 3, 1988. The SOFA, by contrast, nowhere sets forth a process by which foreign workers may be hired in Iraq and hence is in my view not covered by the treaty exemption of the Foreign Regulations.

59. A separate restriction on workers in foreign companies, whether Iraqi or foreigner, appears in Revolutionary Council Command Decree 1097 of 1985. This decree *requires* any Iraqi or foreigner seeking to work for a foreign company in Iraq to file with the relevant labor office and *prohibits* the company in question from hiring workers except through the relevant labor office, and specifically those put forth by the labor office.  (RCC Decree 1097/1985 art. 1, 4).

60. It would be perverse to the aims of the Labor Code to permit an undocumented foreign worker to claim the benefits of the Labor Code, particularly when working for a non-Iraqi company.  If foreign workers—whether diplomats, foreigners covered by the Article 11(1) exemption, or others—were able to bypass rules and regulations that Iraqis were required to go through, and if such foreign workers then could claim the same benefits under the Labor Code that Iraqis could, the result would be that foreign workers would then stand in a preferred position to Iraqis as concerns labor rules. It would be easier to hire them under Iraqi law and once hired, they would have the same protections as any Iraqi.

15

61. The text of Article 2 of the Labor Code, and the Labor Code commentary, make clear that something near the opposite is intended.  The Labor Code is supposed to ensure full employment for Iraqis, and offers protections to those Iraqis in their relations with management, partly by limiting the ability of foreign workers to work in Iraq and claim the benefits of the Labor Code.

**Issues Concerning Translation**

62. Finally, I should note that I have significant concerns as to the accuracy of the Labor Code Translation.

63. In Plaintiff's Appendix Filing, which attaches the Labor Code Translation, Plaintiff indicates that the Labor Code Translation was "prepared by the Global Justice Project: Iraq, a project of the S.J. Quinney College of Law at the University of Utah."  That is not accurate. I know this personally.

64. Plaintiff offers a weblink to the translation.  That same website to which Plantiff sets forth the translation link also lists me under its tab "About: Our People" at the precise link http://gjpi.org/about/our-people/. It describes me, accurately, as the "Constitutional and Legislative Advisor" for Global Justice Project: Iraq.  (I was later promoted to Deputy Chief of Party, though this is not reflected on the website.)

65. As the Constitutional and Legislative Advisor for the project, and later as its Deputy Chief of Party, it was my responsibility to ensure that any material that we translated in connection with our project was accurate and thorough.

66. We did not translate the Labor Code.  It would have been my task to authorize the translation and review it.  I did not, because it did not fall within the scope of our legislative work, a fact that I, as Constitutional and Legislative Advisor, know more than anyone.

16

67. Moreover, it would not even make sense for us to have undertaken the Labor Code Translation. The Labor Code Translation link indicates that it is of an unamended version of the code. The Labor Code was amended three times since its enactment—in 1991, 2000 and by the Coalition Provisional Authority in 2003. Hence, anyone undertaking a translation of that Code between the fall of 2008, when our project began, and the spring of 2010, when it ended, would have surely included those amendments in the translation.

68. It appears on the website because there was a desire on the part of many within the project to include a broader set of Iraqi laws in translation so as to form a sort of Iraq law database in English. We obtained these translations from various outside sources, some public and some private.

69. Despite efforts, I have been unable to determine the origin of the Labor Code Translation, and nobody I have contacted previously associated with the project can recall either.

70. I initially resisted the efforts to include outside translations such as the Labor Code Translation on our website, wanting only translations we had prepared, carefully and painstakingly, and that I had personally reviewed.

71. My concern was that the material would be relied upon, as it is here, when it was really meant only for purposes of general edification.

72. I accepted our inclusion of such material only upon publication of a disclaimer. That disclaimer appears at the start of the section that has a series of Iraqi laws that we have presented in translations which we had not reviewed, *including the Labor Code Translation,* and it reads as follows:

> NB a number of the laws and translations on this page are versions of the laws as originally enacted rather than as amended. Some versions are shown with amendments up to a certain date but no further. *Please do not rely upon these laws as accurate and up to date.* (At link http://gjpi.org/library/primary/statutes/. Emphasis supplied).

17

73. We do not provide such disclaimers for our own translations.  Hence, for example, our translation of important, proposed constitutional amendments from the Iraqi legislature appears on the website at the link, http://content.lib.utah.edu/cdm/ref/collection/qip/id/176. I took extreme care to ensure an accurate translation of this material.  No disclaimer respecting its accuracy is present, nor is one necessary.

74. Hence, Plaintiff is relying upon the accuracy of a translation whose disclaimer indicates that it should not be relied upon for its accuracy.

75. In the context of the Labor Code Translation, there is ample reason for the disclaimer.  The translation appears to have been undertaken by an individual whose mastery of either Arabic or English was not complete, and whose awareness of legal terminology appears to be extremely lacking.

76. I described above my concerns over the translation of *hirasa* as "watchkeeping."

77. Article 66(3) of the Labor Code Translation contains another inaccuracy, referring to "instructions" to be "drawn up by" the Ministry of Labor and Social Affairs.  The correct translation is "regulations issued by" such Ministry.  The difference is not slight, as the status of a regulation in any administrative state is in a different category than that of other statements or directives that might emanate from a Ministry.

78. Article 127(5) in the Labor Code Translation permits dismissal "when the worker has on more than on occasion engage in conduct which is compatible with respect for work." (*Sic*)  Grammatical errors aside, the provision as so read means that one who shows respect for work may be dismissed.  In fact, the import of the clause is the opposite.  It should read "if the worker more than once engaged in conduct that does not harmonize with the dignity of work."

18

79. Finally, the Labor Code translation of Article 1 indicates that the purpose of the Code is to "involve" labor in the process of building a national economy. This is absolutely inaccurate.

80. In no context have I ever heard the Arabic term *tawdhif* from the root verb *wadhafa* to be understood to mean "involve" or anything reasonably close thereto. It means to "assign", to "impose", to "burden", to "encumber", even to "appoint" or to "employ", but never to "involve."

81. The mistake may come by virtue of the fact that the translator confused two similar sounding, but quite different, verbs. The first, *wadhafa,* I have described above, and the second is *dhayafa,* which in one of its forms can mean "to add, connect, annex, or bring into relation." The mistake is not small, similar to confusing the verbs "design" and "assign."

82. The Labor Code Translation as a result does not even give a particularly accurate portrayal of what the Labor Code seeks to achieve and the burdens the state explicitly imposes in it in order to build a national economy. As such, it can hardly be relied upon as a basis to make any sort of legal determinations in favor of either party.

83. I have translated particular provisions of the Labor Code that are relevant to this dispute and attach them hereto as Exhibit A. I do this without prejudice to any objections I might have to the translation of any other provisions of the Labor Code that might later become relevant, either because raised by Plaintiff or for any other reason.

Respectfully Submitted,

Haider Ala Hamoudi
Associate Professor of Law
University of Pittsburgh
School of Law

April 29, 2013

## Exhibit A—Background and Qualifications

I have been at the University of Pittsburgh School of Law since 2007. My current title is Associate Professor of Law. I am also a Non Resident Fellow at the Institute of Iraq Studies at Boston University. For the past several years, I have assisted the Government of Iraq in matters of legislation and constitutional affairs, either through the Ministry of Foreign Affairs or through the United States Embassy in Baghdad. In so doing, I have reviewed Iraqi laws, opinions of the Federal Supreme Court of Iraq concerning Iraqi legislation and the Iraqi constitution, and met frequently with Iraqi legislators on Iraqi legislative priorities. Recently, I was also appointed an expert witness by the District Court in the Hague to address questions concerning the Iraqi law of obligation as they pertained in a civil suit filed by Iraqi civilians against Frans Van Anraat, a Dutch citizen accused of selling material to Saddam Hussein used to manufacture and deploy chemical weapons. Prior to this, I spent most of 2009 advising a committee charged by Iraq's supreme legislative body to draft amendments to the Iraq constitution. I was one of only two advisors permitted to attend and participate fully in the negotiating sessions themselves from which the specific proposals emerged.

Before joining the faculty at the University of Pittsburgh School of Law, I was an Associate in Law at the Columbia University School of Law, beginning in 2005. From 2003-2005, I worked as a Project Manager for two years inside of Iraqi law schools on a USAID funded project organized by the International Human Rights Law Institute of DePaul University. The project focused on improving legal education within Iraq, and on introducing Iraqi law schools to more experience based forms of learning, such as clinics, moot courts and externships. I lectured widely within Iraqi law schools, held a number of joint seminars for Iraqi graduate law students with judges and law professors in the area of commercial law and contracts, and spent a great

deal of time within courtrooms, or in lawyers' offices, often with students, analyzing and discussing both substantive law and legal strategies.

I have a JD and a JSD from the Columbia University School of Law. My primary research interests are Middle Eastern private law, with a primary focus on Iraq, and Islamic law, with a private law focus. Since 2005, I have written approximately over two dozen research papers, a doctoral dissertation and a book, all on the subjects of Iraq, Iraqi law and/or Islamic law. My dissertation deals in significant part with the role that Islamic law plays in the Iraqi legal system, as well as the role of Islamic Law in the organization of commercial activity in Iraq. One of my papers, entitled "Identitarian Violence and Identitarian Politics," and published in the *Harvard International Law Journal (Online)*, describes Iraqi lawmaking in the post-Saddam era with particular regard to the difficulties created by sectarian and ethnic divides. Another, entitled "Notes in Defense of the Iraq Constitution," published in a joint issue of the *University of Pennsylvania Journal of International Law* and the *University of Pennsylvania Journal of Law and Social Change*, offers an alternative paradigm respecting constitution making in highly divided societies, defending the use of ambiguous or incomplete text to manage intractable social divides. A third paper, entitled "The Will of the (Iraqi) People" and published in the *Utah Law Review,* describes the mechanisms of legal doctrinal change in modern Iraq. Several other papers discuss the intersection of Islamic law with Iraqi law, focusing on both Iraqi juristic thought as well as the substance of Iraqi law, and indeed of modern political systems generally. These were published in academic journals such as the Virginia Journal of International Law, the Berkeley Journal of Middle Eastern and Islamic Law, the Journal of Islamic Law and Culture, and the Georgia Journal of International Law. I received the Hessel Yntema Prize in 2009 for the paper

published in the American Journal of Comparative Law, awarded annually to the best article appearing in that journal by an author under the age of 40.

I have read and lectured extensively on Shi'ism, Iraqi law, Middle Eastern law, and Islamic law at universities and bar associations throughout the United States. At the request of the Commercial Law Development Program at the United States Department of Commerce, I have held numerous seminars for Iraqi judges and lawyers comparing Iraqi company and commercial laws to laws of developed and developing jurisdictions.

I currently have a book contract with the University of Chicago Press for a book on legislative and constitutional processes in Iraq that is due to be published in the fall of 2013.

## Appendix A: Translation of Select Portions of Iraq Labor Code, No. 71 of 1987, as amended

**Article 1.** The purpose of this code is to deploy labor to serve in the process of building a national economy, for the purpose of prosperity and the improvement of living conditions.

**Article 2.** This code guarantees the right to work for each national able to do it under equal conditions and opportunities for all nationals, without discrimination on account of gender, ethnic origin, language or religion. What follows from that is the offering of the opportunity of training in professional activities for each national, within the limits that the state outlines respecting the size and type of employment in each professional sector.

**Article 23.** It is prohibited to employ any foreign worker unless he has obtained a work permit pursuant to the conditions and procedures which the Minister of Labor and Social Affairs lays out in regulations he issues.

**Article 42.**
(1) Wages are paid to the worker one time a month at least, during one of the days of work and in the place of work or in a payment center in its immediate vicinity.
(2) Wages are paid in Iraqi currency, and the security of the creditor shall not be deemed satisfied through payment of other currencies or forms of wealth.

**Article 45.** The setting of the wages may be on the basis of a lump sum or in accordance with any other regime that sets the value of the wage based on the production of the worker, so long as it does not fall below the minimum wage of an unskilled worker.

**Article 47.** An agreement between an employer and a worker on a wage less than the minimum wage of an unskilled worker is prohibited.

**Article 55.** The time of work is eight hours, subject to the exceptions set forth in this law.

**Article 56.** For work that takes place in two periods, and for work that is sporadic, it is not permitted to keep the worker in the place of work for more than twelve hours, and the hours of actual work shall not exceed eight hours a day.

**Article 58.**

(1) A period or more of not less than half an hour cumulatively and not more than an hour must come between the hours of work for the purposes of a meal and rest. The employer shall determine their time, provided that the uninterrupted hours of work do not exceed five.

(2) In projects where work may not pause for technical reasons, or because of the nature of the project or service which is being carried out, the worker shall be granted a rest period or more which is not less than twenty minutes cumulatively.

(3) For work that is of two periods, the period of rest between them shall not be less than one hour, and shall not exceed four hours.

**Appendix A: Translation of Select Portions of Iraq Labor Code, No. 71 of 1987, as amended**

**Article 60.**

(1) A worker is entitled to a weekly rest of not less than one day with pay.

(2) The employer shall organize the dates that the workers obtain the weekly rest as a group or in rotations, on condition that he determines for each worker a set date for the weekly rest.

**Article 61.**  The employer may agree with the workers on their working during the days of their weekly rest and the official holidays that are interposed in the work month, provided that he compensates them for that with a cash equivalent or with consolidated vacation days.

**Article 64.**

(1) Work that takes place during the time of daily or weekly rest, or hours in excess of the daily work, is regarded as additional work.

(2) The wages for additional work are double that of the wages for work, if the work is at night or it is arduous or harmful, and it is an increase of 50% of wages of work, if the work is by day.

(3) If the worker works during his day of weekly rest, then he must be compensated with a day of rest during one of the days of the week.

**Article 66.**
(1) The rules of this section do not apply to agricultural or domestic workers.

(2) The provisions of Article 56 of this law do not apply to the following workers:

    (a)  Those working in preparatory or finalizing work whose execution has been set for before or after work.

    (b)  Those working as security guards.

**Article 122.**  The worker must adhere entirely to the provisions of this law, the regulations and decrees issued pursuant thereto, the provisions of the individual and collective contracts of labor and the internal rules of the work(place).  The worker must execute (the work) in good faith and with devotion and fidelity, in a manner that serves the interest of production.

**Article 130.**  Labor strife means collective disputes that affect the common interests of workers that arise between them and employers in one or more enterprises, or one or more professions or industries, over what may arise in the implementation of the Labor Code or its regulations, or its individual contracts, in the form of conflicting perspectives.  These disputes are characterized as labor strife, if a solution to them on amicable terms as between the two groups in strife is unreachable.

**Article 131.**  When collective differences at work mature into disputes in accordance with Article 130 of this law, the relevant employer or employers are obligated, or the relevant labor

## Appendix A: Translation of Select Portions of Iraq Labor Code, No. 71 of 1987, as amended

union bodies are obligated, each from their own side, to immediately caution the Minister of Labor and Social Affairs and the Head of the General Confederation of Labor Unions simultaneously of the dispute which has broken out, and provide a succinct and complete memorandum as to its causes and its evolution, and the incumbent procedures to address it and solve it.

### Article 132.

(1) Immediately upon receiving the caution, the Minister of Labor and Social Affairs shall have the power to make the necessary communications with the employers and their relevant organizations, to urge them to take urgent measures to end the causes of the dispute, and to mediate and solve it.

(2) Immediately upon receiving the caution, the Head of the General Confederation of Trade Unions shall have the power to contact all of the relevant union bodies, and the other relevant labor parties to the dispute, to urge them to take urgent measures to prevent a crisis [arising from] their position, to call them to positive methods of conduct in investigating the dispute, and to work to end its causes and mediate it in an amicable manner.

(3) The Minister of Labor and Social Affairs, and the Head of the General Confederation of Trade Unions, or their representatives, shall exchange information respecting what each of them has been able to determine from their efforts. They shall engage in continuous dialogue over the necessary steps to take, and they shall meet together with the representatives of the parties to the dispute and investigate with them their differing perspectives in an effort to bring them closer and to reach a mutually agreeable solution.

(4) If the efforts of the Minister of Labor and Social Affairs and the Head of the General Confederation of Trade Unions manage to result in a solution within three days of the date of the caution at the most, a meeting shall be convened with equal numbers (of representatives of the parties) headed by the Head of the General Confederation of Trade Unions. The General Director of the Directorate of Labor and Social Affairs shall be empowered in the role of secretary. Minutes of this meeting shall be prepared, recording the points of agreement in four original copies, signed by each of those present. One of (the copies of the minutes) shall be in the Ministry of Labor and Social Affairs, the second in the General Confederation of Trade Unions, the third with the employer and the fourth with the workers. The parties to the dispute shall be bound by the agreement and it shall be effective immediately.

(5) If the efforts of the Minister of Labor and Social Affairs and the Head of the General Confederation of Trade Unions fail to result in a solution acceptable to all within the period specified in paragraph (4) of this Article, the two shall be obligated to transfer the case to the Minister of Justice with a joint writing to call upon the Labor Judicial Panel of the Court of Cassation to convene within 48 hours, at most, to look into the dispute. The panel shall remain convened at all times until it issues its ruling on the dispute presented to it.

(6) The Labor Judicial Panel of the Court of Cassation may call the Minister of Labor and Social Affairs and the Head of the General Confederation of Trade Unions or their representatives, and

## Appendix A: Translation of Select Portions of Iraq Labor Code, No. 71 of 1987, as amended

the two parties to the dispute, to hear their statements, and it may take all other measures for the purpose of deciding the dispute.

**Article 133.** The Judicial Labor Panel of the Court of Cassation shall issue its decision within 15 days of the date that the dispute was presented to it, in an open session in the presence of the two sides of the dispute, and its decision shall be final.

**Article 146.** The rules of the Civil Procedure Code and the Criminal Procedure Code, each in its respective place, shall apply to the extent that it does not refute any specific provision of this law.

**Dr. Haider Ala Hamoudi**
University of Pittsburgh School of Law
3900 Forbes Ave.
Pittsburgh, PA 15260

Email : hamoudi@pitt.edu
Tel. 412-624-1055

## Publications
### Books, Dissertations

- NEGOTIATING IN CIVIL CONFLICT: CONSTITUTIONAL CONSTRUCTION AND IMPERFECT BARGAINING IN IRAQ
  (U. Chi. Press 2013 forthcoming)

- HOWLING IN MESOPOTAMIA: AN IRAQI AMERICAN MEMOIR (Beaufort Books 2008)

- TOWARD A LEGAL UNDERSTANDING OF THE SHARI'A (Columbia University Dissertation, 2009)

### Law Review Articles, Book Chapters

- *Arab Spring, Libyan Liberation and the Externally Imposed Democratic Revolution,* 89 DEN. U. L. REV. 699 (2013)

- *Religious Minorities and Shari'a in Iraqi Courts,* 30 BOSTON U. INT. L. J. __ (2013) (forthcoming).

- *Book Review: Islamic Law in Action,* 28 J. L. & REL. __ (2013)(forthcoming).

- *On the Political Appeal of Islamic Finance,* 2013 SARAJEVO CONFERENCE PROCEEDINGS, BUSINESS IN BETWEEN CULTURES (European Association of Banking and Financial History)(forthcoming).

- *Transparency and the Shi'i Clerical Elite,* in INTERNATIONAL TRANSPARENCY HANDBOOK (E.Elgar 2013)(forthcoming).

- *Repugnancy in the Arab World,* 48 WILLAMETTE L. REV. 427 (2012)

- *The Surprising Irrelevance of Islamic Bankruptcy,* 19 AM. BANKR. INST. L. REV. 505 (2012)

- *The American Commercial Religion,* 10 DEPAUL BUS. & COM. L. J. 107 (2012)

- *Notes in Defense of the Iraqi Constitution,* 32 U. PA. J. INT'L L. 1117; 14 U. PA. J. L. & SOC. CHANGE 395 (2012).

- *International Law and Iraqi Courts,* in INTERNATIONAL LAW IN DOMESTIC COURTS: RULE OF LAW REFORM IN POST-CONFLICT SOCIETIES (Intersentia 2012)

- *The Will of the (Iraqi) People,* 2011 UTAH L. REV. 45 (2011)

- *Present at the Resurrection: Islamic Finance and Islamic Law,* 26 AM. J. INT. L. 1107 (2011)

- *Book Review: Constitutional Theocracy,* 49 OSGOODE HALL L. J. 151 (2011)

- *Ornamental Repugnancy: Identitarian Islam and the Iraq Constitution,* 23 St. Thom. L. Rev. 692 (2011)

- *Book Review: Islam and Liberal Citizenship,* 26 J. L. & Rel. 387 (2011)

- *Identitarian Violence and Identitarian Politics: Elections and Governance in Iraq* 51 Harvard Int. L. J. Online 82 (2010)

- *The Death of Islamic Law,* 38 Georgia J. Int. L. 293 (2010).

- *Between Realism and Resistance: Shi'i Islam and the Contemporary Liberal State,* 11 J. Isl. L. & Cul. 107 (2009).

- *Book Review: The Crisis of Islamic Civilization,* 47 Osgoode Hall L. J. 159 (2009).

- *Dream Palaces of Law: Western Constructions of the Muslim Legal World,* 32 Hast. Int. & Comp. L. Rev. 803 (2009).

- *Between Symbiosis and Schizophrenia: The Rights of Iraqi Refugees under Iraqi Law,* 34 Rutgers Law Record 31  (2009).

- *Book Review:  Orientalism and The Fall and The Rise of the Islamic State* 2 Mid. E. L. & Gov. 81 (2009)

- *The Muezzin's Call and the Dow Jones Bell: On the Necessity of Realism in the Study of Islamic Law,* 56 Am. J. Comp. L. 423 (2008)  (Winner of the Hessel Yntema Prize Awarded by the American Society of Comparative Law to the Best Article in the AJCL by a Scholar Under the Age of 40)

- *You Say You Want a Revolution:  Deviationist Doctrine, Interpretive Communities and the Origins of Islamic Finance,* 48 Va. J. Int. L. 249 (2008)

- *Baghdad Booksellers, Basra Carpet Merchants, and the Law of God and Man: Legal Pluralism and the Contemporary Muslim Experience,* 1 Berk. J. Isl. & Mid. East. L. 83 (2008)

- *Muhammad's Social Justice or Muslim Cant?: Langdellianism and the Failures of Islamic Finance,* 40 Cornell Int. L. Rev. 89 (2007)

- *Money Laundering Amidst Mortars:  Legislative Process and State Authority in Post-Invasion Iraq,* 16 Trans. L. & Contemp. Prob. 523 (2007).

- *Jurisprudential Schizophrenia: On Form and Function in Islamic Finance,* 7 Chi. J. Int. L. 605 (2006)

- *Toward a Rule of Law Society in Iraq: Introducing Clinical Legal Education into Iraqi Law Schools*, 23 Berkeley J. Int. L. 113 (2005)

**Online Articles for Jurist, a Leading Website for Legal News and Research**

- *Iraq's Islamic Bank and the Islamicity of Interest* (Jan. 14. 2013)

- *Iraq Oil Sector Misfortunes* (Aug. 6, 2012)

- *Democracy and the Supreme Constitutional Court of Egypt* (June 28, 2012)

- *Confederalization and Unanticipated Circumstances in Iraq* (June 6, 2012)

- *Judicial Review of Islamic Law in Iraq* (April 26, 2012)

- *Human Rights and Personal Freedoms in Iraq* (March 14, 2012)

- *Irregularities of Criminal Justice in Egypt and Iraq* (Feb. 27, 2012)

- *Post War Iraq: Slow and Steady Progress* (Dec. 14, 2011)

- *The Problem of Legitimacy in International Criminal Justice* (July 7, 2011)

- *Balance of Power Under the Iraqi Constitution* (March 18, 2011)

- *Religion and Law in Iraq: A Noteworthy Federal Supreme Court Opinion* (Feb. 10, 2011)

- *The Iraqi High Court's Understated Rise to Legitimacy* (April 23, 2010)

- *Kirkuk: The Danger of Delay* (Nov. 6, 2009)
- *Reconsidering the "Rule of Law" in Iraq* (Sept. 8, 2009)
- *Iraqi SOFA Jurisdiction Over US Soldiers: A Matter of Necessity* (Nov. 18, 2008)
- *Act of Commission: Iraq's Provincial Elections Law and the Problem of Kirkuk* (Sept. 30, 2008)
- *The Iraqi Oil Contract and the Importance of Independent Counsel* (July 9, 2008)
- *The Role and Rule of Law in Iraq: An Insider's Perspective* (May 23, 2008)
- *The Kurdish-Shi'i Alliance and New Legislation in Iraq* (February 13, 2008)
- *A Modest Proposal on Kirkuk* (December 20, 2007)
- *Iraq's Parliament: A House (Even More) Divided* (November 28, 2007)
- *Shi'ism, Sunnism and State Authority in Iraq* (July 20, 2007)
- *The Hunt Oil Dispute and the Future of Iraqi Federalism* (Sept. 13, 2007)

**Other Media, Articles**
- *Navigating the Najaf Mantra with the Four Grand Ayatollahs* (*Daily Star Lebanon*  Nov. 5, 2009)
- *The "Discovered" Supreme Leader and the Rule of Law* (*Daily Star Lebanon* Oct. 1, 2009)
- *Why an Iraq Ruled by Law is More Hopeful* (*Daily Star Lebanon,* July 9, 2009)
- *Legal Lip Service* (Forbes.com, April 21, 2008)
- *The Economic Rights of Displaced Iraqis, under Iraqi Law* (ILSA Quarterly 17:1, March 2008)

**Blog**

Author of Blog on Islamic Law entitled *Islamic Law In Our Times* (http://muslimlawprof.org)

# Presentations

**Academic, Legal**
- *Religious Minorities in the Islamic State: The Example of Iraq,* Boston University Law School (March 25, 2013)
- *Legality in the Revolution,* Osgoode Hall, York University (March 15, 2013)
- *The Myth of the Islamic State,* Islamic Law Section, American Association of Law Schools Annual Meeting (Jan. 6, 2013)
- *Thinking Beyond the Original Bargain,* Fall 2012 Iraq Workshop, Boston University (November 30, 2012)
- *The Politics of Islamic Finance,* Business in Between Cultures, University of Sarajevo (November 16, 2012)
- *US Regulation of Islamic Finance,* International Law Weekend, Fordham University School of Law (October 27, 2012)
- *Shari'a in the Arab Spring,* Seasons of the Arab Spring, Global Studies Center, University of Pittsburgh (March 30, 2012)
- *Islamic Law and the Islamic State,* Keynote Address, United States Military Academy (West Point) (March 29, 2012)
- *A Primer on the Shari'a,* Pittsburgh Area Jewish Council (Feb. 27, 2012)

- *Identifying Canon from Anticanon,* U. Maryland School of Law (Feb. 24, 2012)

- *Repugnancy and the Arab Canon,* Williamette School of Law (Feb. 15, 2012)

- *Transparency, Muslim Jurists and the Shari'a,* Annual Meeting of the American Association of Law Schools (Jan. 7, 2012)

- *Shari'a, Halacha, Canon Law: Threat or Threatened,* Rodef Shalom Congregation (sponsored by University of Pittsburgh School of Law and Pittsburgh Area Jewish Committee) (Dec. 12, 2011)

- *Islamic Finance and Muslim Belonging,* Aston University (Birmingham, UK) (Dec. 3, 2011)

- *Islam and the Iraqi Constitution,* Earle Macke School of Law, Drexel University (Nov. 14, 2011)

- *The Surprising Irrelevance of Islamic Bankruptcy,* St. John's School of Law (Sept. 16, 2011)

- *The Role of NGO's Toward the Creation of a Culture of Democratization in the Middle East,* Lebanese American University (Beirut, Lebanon) (July 21, 2011)

- *Democracy and the Shari'a,* New York City Bar Association (May 25, 2011)

- *What is an Islamic Bank,* Boalt Hall School of Law, University of California (Berkeley), (April 9, 2011)

- *The Evolution of the Iraq Constitution,* Widener University School of Law (Harrisburg) (March 22, 2011)

- *Iraqi Oil and Gas,* Tulsa University Law School, Tulsa, OK (February 26, 2011)

- *Islam and the International* (Commenter), Santa Clara University Law School, Santa Clara, CA (February 19, 2011)

- *Religious and State Loyalties in Iraq,* St. John's Law School, Queens, NY (November 5, 2010)

- *Minority Rights in Company Law: A Comparative Perspective,* Fordham University School of Law, to a Panel of Senior Iraqi Judges, New York, New York (October 8, 2010) (in Arabic)

- *U.S. and Iraqi Company Law,* Fordham University School of Law, to a Panel of Senior Iraqi Judges, New York, New York (October 7, 2010) (in Arabic)

- *The Challenges of Constitutional Supremacy in Iraq,* SJ Quinney School of Law, University of Utah, Salt Lake City, UT (October 2, 2010).

- *The Regulatory State in Iraq,* University of Pennsylvania School of Law, Philadelphia, PA (September 24, 2010)

- *Islamic Finance in the 21st Century* (Moderator and Commentator), Plenary Session, International Academy of Comparative Law, Washington DC (July 27, 2010)

- *Economic Reconstruction and the Rule of Law in Iraq,* University of South Carolina (May 12, 2010)

- *Ornamental Repugnancy,* St. Thomas University School of Law (April 12, 2010).

- *Arbitration in Arab Lands,* Columbia University School of Law, to the Legal Directorate of the Iraqi Oil Ministry (Feb. 16, 2010) (in Arabic)

- *Islamic Capital Markets and the Spirit of Shari'a,* New York City Bar Association Special Event (February 8, 2010)

- *Federalism in Iraq and Abroad,* Council of the Presidency of Iraq, (December 22, 2009) (in Arabic)

- *The Iraq Constitution and Presidential and Parliamentary Systems of Governance,* Council of the Presidency of Iraq (December 8, 2009) (in Arabic)

- *Decentralization in Iraq and in Comparative Perspective,* Conference with the Legal Committees of the Iraqi Provincial Councils (October 25, 2009) (in Arabic)

- *Teaching Islamic Law in Law School,* Venice Conference on Islamic Law Pedagogy (Sept. 17, 2009)

- *The Death of Islamic Law,* Duke University Law School (March 2, 2009)

- *Rhetoric and Reality in Islamic Finance,* Fordham University School of Law (February 26, 2009)

- *Why Do* We *Study Religious Law: Thoughts from the Islamic Perspective,* Jewish Law Section, American Association of Law Schools Annual Meeting (Jan. 6, 2009)

- *Rights of Iraqi Refugees under Domestic Iraqi Law,* Rutgers University (Newark) School of Law (October 24, 2008)

- *Dream Palaces of Law: Western Constructions of the Muslim Legal World,* Annual Conference of the American Society of Comparative Law (October 3, 2008)

- *Commerce among Merchants in Shi'i Iraq,* University of Cincinnati School of Law (April 25, 2008)

- *A Comparison of Shi'i and Sunni Approaches to Religious Authority in Contemporary Islam,* Univ. of Pittsburgh Dept. of Religious Studies (Feb. 13, 2008)

- *Fatawa in Shi'i Islam,* New York City Bar Association Special Event (January 22, 2008)

- *Islamic Finance, A View from the Mosque,* Asian Affairs Section, New York City Bar Association (January 15, 2008)

- *Liberalism and Shi'i Islam,* Yale University (December 7, 2007)

- *Shi'ism and Sunnism in Contemporary Iraq,* American Association of Law Schools (January 5, 2007)

- *Legal Realism and American Jurisprudence,* Qatar University Law School (December 1, 2006) (in Arabic)

- *Clinical Education and Iraqi Law Schools,* Conference on Arab Legal Education, Doha, Qatar (November 10, 2006) (in Arabic)

- *State Authority in Post Invasion Iraq,* George Washington Univ. Law School (October 3, 2006)

**Other**

- *The Tragedy of Iraq's Refugee Crisis,* Chicago Humanities Festival (November 6, 2008)

- *Iraq Between the Personal and the Political,* San Jose Book Expo (October 25, 2008)

- *Iraq at the Crossroads,* Al Hewar Center (August 9, 2008) (in Arabic)

# Professional Experience

**June 2007—Present**          **U. Pitt. School Of Law**          **Pittsburgh**
**Assistant Professor of Law**
Subjects: Contracts, Commercial Transactions, Islamic Law

Areas of Research: Iraqi Law, Transnational Commercial Law, Middle Eastern Commercial Law, Islamic Law and Finance

Law School Committees: Appointments Committee (Chair) (2012-2013); Budget (2011-2013);
Ad Hoc Committee on Bar Examination Results (2011-2012); Dean's Search (2011-2012);
Legal Writing Awards (2011-2012); Appointments (2010-2011);
ABA Renewal (2010-2011);Legal Writing Awards (2009-2010);
Steering (2008-09); Colloquium (2008-09); Appointments (2007-08).

AALS: Islamic Law Section Chair Elect (2013-2014); Executive Committee (2008-13);
Comparative Law Section Executive Committee (2012-2013)
IBA Committee: Co-Rapporteur, Islamic Law Section (2011-2012)
Coach of Pitt Jessup International Moot Court Team (2009)

**July 2005—June 2007   Columbia Law School   New York City**
**Associate in Law**

**Dec. 2003—July 2005   DePaul University   Baghdad, Iraq**
**Project Manager**
Manager of a USAID funded project to reform legal education in Iraq. Coached first two Iraqi teams to participate in the Jessup International Moot Court Competition in Washington (2005 and 2006).

**Dec. 2003-June 2004   Iraq Governing Council  Baghdad, Iraq**
**Legal Advisor, Finance Committee**
Engaged in legal review of all commercial and financial legislation presented to the Iraqi Governing Council for its approval, including current laws on money laundering, copyright, securities and bankruptcy.
**Dec. 1997-May 2003   Debevoise & Plimpton   Hong Kong, East Java**
**Associate**                                    **and New York**

**Sept. 1996—Sept. 1997 Southern District of New York        New York**

**Law Clerk to Hon. Constance Baker Motley**

# Other Relevant Experience
**Academic**

**October 2011-Present**
Nonresident Senior Fellow, Boston University Institute for Iraq Studies.
The Institute is part of Boston University's College of Arts and Sciences. Senior Fellows of the Institute are "established scholars whose work contributes significantly to understanding Iraq." The Institute's mission is "to enable, foster and encourage inter-disciplinary scholarship on contemporary Iraq, including but not limited to religious institutions and practices, politics, society, history and culture, as well Iraq's regional and international relations."

### April-December 2009

Legislative Consultant

(On leave, Fall 2009). Based primarily in Baghdad working on a grant funded by the Constitutional and Legislative Affairs Office of the U.S. Embassy in Baghdad. Primary responsibility is attending all meetings of the Constitutional Review Committee of the Iraqi Parliament and participating in all discussions related to a critical series of constitutional amendments designed to ensure Sunni support of the Constitution.

### Summer 2008

Legal Consultant

Assisted International Human Rights Law Institute in collection and presentation of data relating to human rights violations committed by the Saddam regime in southern Iraq.

### Dec. –April, 2007-2010

National Administrator

Advised, Escorted and Arranged for Participation of Iraqi Team in 2007-2010 Jessup International Moot Court Competitions.

### Other

### Summer 2008-Septmber 2010

Expert witness for Guantanamo Bay detainee on issues concerning Iraqi and Islamic law and culture.

# Education

### 2008          Columbia Law School       New York
### Doctor of Juridicial Science (J.S.D.)

Dissertation, entitled *Toward a Modern Understanding of the Sharia,* articulates a modern, legal approach to Islamic Law, with a particular focus on the legal context of Shi'i Iraq.

### 1993-1996    Columbia Law School       New York
### Juris Doctor

- Stone Scholar (top 15% of class) for all three years.
- Managing Editor, *Journal of Transnational Law.*
- Research Asst. to Prof. H. Edgar on legal and ethical consequences of various biomedical advances.

### 1989-1993    Massachusetts Institute of Technology     Cambridge, MA
### Bachelor of Science, Physics w. Electrical Engineering Minor
### Bachelor of Science, Humanities (Islamic/Near Eastern Studies)

- Member of Sigma Pi Sigma, Physics Honor Society.
- Selected as Burchard Scholar for Excellence in the Humanities and Social Sciences for bachelor's thesis relating to the structural development of Iraqi political parties in the pre-Ba'ath era.

# Other

- Fluent in Arabic, proficient in German, Bahasa Indonesia.
- Admitted to practice in New York State and the Southern District of New York.