UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KARL E. RISINGER,

Plaintiff,

v.

SOC LLC, *et al.*,

Defendants.

Case No. 2:12-cv-00063-MMD-PAL

ORDER

**I.  SUMMARY**

This is a class action involving a dispute over the terms of employment for armed guards hired to work in Iraq. Before the Court are the following motions: (1) Defendants SOC LLC; SOC-SMG, Inc.; and Day & Zimmermann, Inc.'s (collectively, "Defendants") motion to decertify class ("Decertification Motion") (ECF No. 344); (2) Defendants' second motion for summary judgment (ECF No. 342); and (3) Plaintiff Karl E. Risinger's emergency motion to strike Defendants' second motion for summary judgment (ECF No. 345). The Court has reviewed the relevant responses (ECF Nos. 353, 356) and replies (ECF Nos. 354, 357) thereto.[1] For the following reasons, the Court grants Defendants' Decertification Motion and denies the remaining motions as moot.

**II.  BACKGROUND**

The Court certified a class in this case consisting "of armed guards who worked for SOC in Iraq between 2006 and 2012." (ECF No. 254 at 7 (citing ECF No. 155 at 19, 27).) The Court later clarified that Reclassified Guards—individuals who held job titles other than "Guard" during their employment with Defendants because Defendants changed their

///

---

[1]The Court need not consider any response or reply to Defendants' second motion for summary judgment given that it will be denied as moot. (*See also* ECF No. 346 (staying the deadline for Plaintiff to respond to Defendants' second motion for summary judgment).)

job title and/or salaries upon, or shortly after, their arrival in Iraq—were members of the class because they were, in effect, "armed guards who worked for SOC in Iraq between 2006 and 2012." (*See* ECF No. 281 at 2-4.) Defendants now move to decertify the class because additional discovery purportedly has revealed that questions common to the class members no longer predominate over questions affecting only individual members. (ECF No. 344 at 8; *see also* Fed. R. Civ. P. 23(b)(3).)

### III. LEGAL STANDARD

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Thus, a "district court may decertify a class at any time," *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009), and in fact must monitor "class decisions in light of the evidentiary development of the case." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*, No. 12-CV-01685-BAS(JLB), 2016 WL 2610107, at *5 (S.D. Cal. May 6, 2016), *aff'd sub nom. NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528 (9th Cir. 2019) (hereinafter "*NEI Contracting*") (quoting *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983)). "In evaluating whether to decertify the class, the court applies the same standard used in deciding whether to certify the class initially." *Id.* "Thus, a motion to decertify a class is not governed by the standard applied to motions for reconsideration, and does not depend on a showing of new law, new facts, or procedural developments after the original decision." *Id.* The plaintiff bears the burden of demonstrating that the requirements of Rule 23 are satisfied, even in the context of a motion for decertification.[2] *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (quoting *United Steel Workers v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010)) ("Thus, as to the class-decertification issue, Marlo, as '[t]he party seeking class certification [,] bears the burden of demonstrating that the

---

[2]While some district courts have continued to place the burden on the moving party post-*Marlo*, placement of the burden is not outcome-determinative in this case. Defendants have carried any burden they have of demonstrating that the requirements of Rule 23 are not satisfied, and Plaintiff has failed to carry any burden he has of demonstrating that they are. Moreover, Plaintiff has not disputed this issue as his opposition does not contain a legal standard section. (*See* ECF No. 356.)

2

1 | requirements of Rules 23(a) and (b) are met.'"); *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds*, 139 S. Ct. 710 (2019) (citing *Marlo*, 639 F.3d at 947).

**IV.   DISCUSSION**

Defendants argue that the class should be decertified because individual issues predominate over questions common to the class and because the class is unmanageable given that Plaintiff has failed to offer a classwide method for determining liability or calculating damages. The Court agrees with Defendants and will decertify the class. The Court discusses predominance before turning to the class's manageability.

**A.    Predominance**

Any certified class must satisfy the following prerequisites: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (citing Fed. R. Civ. P. 23(a)). In addition, "the class action must fall within one of the three types specified in Rule 23(b)." *Id.* The Court certified this class under Rule 23(b)(3), which requires that "questions of law or fact common to class members" must "predominate over any questions affecting only individual members," and the class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

"The predominance inquiry under Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* at 557 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "It 'presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2),' and focuses on whether the 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication'; if so, 'there is clear justification for handling the dispute on a representative rather than on

an individual basis.'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)).

"[I]mportant questions apt to drive the resolution of the litigation are given more weight in the predominance analysis [than] individualized questions . . . of considerably less significance." *Id.* (quoting *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016)). Thus, an action may be considered proper under Rule 23(b)(3) even if just one common question predominates. *Id.* (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). Rule 23(b)(3) lists four matters pertinent to a finding of predominance: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

When initially certifying the class, the Court identified three common questions driving this litigation: (1) whether SOC promised recruits a 72-hour workweek in order to induce them to accept a job offer; (2) whether SOC knew that guards would in fact be required to consistently work longer hours due to a preventable understaffing practice; and (3) whether class members are entitled to damages for regularly working beyond 72 hours. (ECF No. 155 at 22.) The Court found that Plaintiff adduced common proof of answers to each of these questions. In answer to the first question, Plaintiff relied on call scripts showing that SOC consistently promised recruits a 72-hour workweek. (*Id.* ("Risinger . . . provided evidence indicating that class members received similar or identical messages" about working "a shift of 6 days per week with 12-hour days.").) In answer to the second and third questions, Plaintiff relied on Defendants' uniform practice of understaffing, a practice suggested by "deposition testimony from one of SOC's Rule 30(b)(6) designees acknowledging that SOC suffered a labor shortage and received complaints from guards that they were working 7 days a week." (*Id.* at 22-23.)

///

The Court found that these common questions predominated over any individual questions because "the class members' contract and quasi-contract claims are based on the same uniform representations and standardized employment agreements." (*Id.* at 25.) Defendants argued that individual questions regarding whether each class member relied on the 72-hour-workweek representation would overwhelm the litigation, but the Court reasoned—in light of evidence that the representations were identical or nearly identical—that reliance would be presumed: "[c]ommon sense would suggest that recruits considering whether to work as armed guards in a warzone would find the promise of an occasional day off relevant to their decision to accept employment." (*Id.* at 26.)

Newly presented evidence shows that—despite the existence of these common questions of law—individual questions about whether and why class members actually worked more than 72 hours now predominate. The newly presented evidence consists of class member testimony showing that (1) some class members never worked more than 72 hours; (2) the effect of any uniform understaffing practice varied based on each class members' assigned location; and (3) the effect of any uniform understaffing practice varied based on class members' own choices.

As a threshold matter, Plaintiff argues that the Court should not consider any of the newly presented evidence because it was obtained in violation of the Court's discovery orders. (*See* ECF No. 356 at 14.) Plaintiff bases his argument on the bifurcated discovery schedule in this case. (*Id.* at 14-15; *see also* ECF No. 77.) The first phase ("Phase I") was reserved for "**all** discovery with the exception of class damages discovery, and punitive damages discovery should the district judge grant a motion to certify a class." (ECF No. 77 at 4.) The second phase ("Phase II") was reserved for "cleanup damages discovery, if the district judge certifies a Class." (ECF No. 78 at 14.) Plaintiff essentially contends that Defendants cloaked liability questions as damages questions during Phase II in order to surreptitiously revisit Phase I in contravention of the discovery schedule. (*See* ECF No. 356 at 14-15.)

///

The Court finds Plaintiff's argument unpersuasive. Plaintiff never objected to any of the testimony that Defendants rely upon when it was being taken.[3] Moreover, despite the bifurcation, damages and liability are intertwined in the context of Plaintiff's claims. (*See* ECF No. 155 at 6, 14 (listing damages as an element of Plaintiff's fraud claim as well as Plaintiff's breach of contract claim).) As Defendants' counsel asserted at the hearing, it was impossible for Defendants to avoid learning that some class members had no damages—and therefore no viable fraud or breach of contract claims—when they were conducting damages discovery. Accordingly, the Court will consider the newly presented evidence.

The Court finds that the newly presented evidence persuasively demonstrates that individualized issues of liability predominate over the common questions identified at the outset of this litigation. Significantly, the evidence shows that some class members never worked more than 72 hours. The evidence also shows that Plaintiff's common proof of overwork—Defendants' practice of understaffing—is fatally flawed: the effects of any uniform understaffing practice varied widely depending on class members' locations, vehicle conditions, weather conditions, and personal work preferences.[4]

### 1. Whether Class Members Worked More Than Promised

Defendants have produced evidence that some class members never worked more than 72 hours per week. (*See* ECF No. 344 at 16-17.) For example, class member Lance Muth testified that he always got a day off and never worked more than 12 hours in the 13 months he worked for SOC during the class period, including the three months he worked at the same site as Risinger. (ECF No. 344-2 at 3, 6-8.) Defendants also cite to the deposition testimony of two other class members—Bryce Light and Carl Childs—who did not work more than 72 hours per week. (ECF No. 344 at 16; ECF No. 344-3 at 3 (Light

---

[3]Defendants' counsel argued this point at the hearing, and Plaintiff did not rebut her assertion. This assertion also is borne out by the record.

[4]While Plaintiff's unrebutted common proof might be sufficient to show commonality, it is insufficient to establish predominance in light of the evidence Defendants now present.

6

deposition); ECF No. 344-25 at 3-4 (Childs deposition).) Defendants also cite the deposition testimony of class members who only worked extra hours occasionally—not regularly. (*See* ECF No. 344 at 16-17.) For example, class member Todd Dupont testified that he worked a seventh day just four times in a year. (ECF No. 344-30 at 8, 12.) Defendants cannot be liable to class members who did not work more than 72 hours per week because they suffered no damages. And it seems that the only way to determine which class members worked more than 72 hours per week is to ask them individually. *See infra* Section IV(B)(1).

Plaintiff argues that the three common questions the Court identified at the outset of the litigation continue to predominate based on the common proof that Plaintiff offers to answer those questions: testimony by Defendants' 30(b)(6) designees that (1) recruiters would follow an identical script informing potential recruits to expect a six-day/12-hour workweek; (2) contracts given to class members were standardized and contained no mention of any differential between in-country and out-of-country pay or reduced pay for vacations; and (3) Defendant's offer of employment and employment agreement specified an annual salary of $65,000 and 42 vacation days per year. (ECF No. 356 at 19 (citing ECF No. 121 at 7-9).) Plaintiff also relies on Defendants' bidding documents showing that they bid the contract in such a way that they could not give days off.[5] (*Id.* at 21 (citing ECF No. 151 at 6-10).)

But much of Plaintiff's common proof is unrelated to what has now become the essential question in this case—whether Defendants are liable to every class member because every class member worked more than 72 hours. Plaintiff's common evidence of representations that SOC made to recruits does not establish that class members actually worked more than 72 hours. And Plaintiff's common evidence of a uniform practice of understaffing also does not in itself establish that every class member actually worked

///

---

[5]Plaintiff refers to the method of bidding Defendants used as "bidding to the man"—"an approach to staffing that eliminate[s] rotational personnel (i.e. people in reserve to relieve the weary and infirm)." (ECF No. 151 at 8.)

more than 72 hours. Indeed, Defendants have introduced direct evidence showing that they did not. In addition, Plaintiff's evidence does not conclusively show that all sites were understaffed. Class members worked at 22 sites throughout Iraq. (ECF No. 344 at 9 n.1.) Defendants' 30(b)(6) witnesses only testified as to the existence of an understaffing problem generally, and one of them testified that there was a "staffing issue or a scheduling issue at LBS," the site where Plaintiff worked and one of the nine sites associated with a multi-base complex called Victory Base Complex ("VBC"). (*See* ECF No. 119 at 9 (quoting ECF No. 119-2 at 10-11); ECF No. 104-11 at 8, 17-18; ECF No. 344 at 9 n.1.) It is not clear from this testimony—particularly in light of the evidence obtained in Phase II that individuals at certain sites never worked more than 72 hours[6]—that all sites were understaffed and that all class members at those sites actually worked more than 72 hours.

Thus, what initially appeared to be a uniform practice of understaffing that uniformly resulted in overwork now seems to be a limited practice that affected only class members at certain sites. The Court finds persuasive Defendants' cited decision of *Autozone*, 2016 WL 4208200, in which the court decertified a class under similar circumstances. There, the court initially certified a class of hourly paid employees of California Autozone stores asserting that Autozone's rest break policies violated California law. *Id.* at *1. The court found that common questions predominated over individual questions because the claims were based entirely on the legality of Autozone's uniform written rest break policy. *Id.* at *2. But discovery revealed that the policy was not in place throughout the entire class period and that there were no audit records or any other time records of when class members took rest breaks. *Id.* at *9. Discovery also revealed that some employees were allowed to take rest breaks in compliance with California law. *Id.* at *11. The court decertified the class based on these evidentiary changes, reasoning that "[b]ecause there

---

[6](*See, e.g.*, ECF No. 344-28 at 4 (class member Joshua Axmaker's testimony that he never observed anyone at Taji [one of the SOC sites] work more than 12 hours in a day); ECF No. 344-4 at 13 (class member Nathan Seegmiller's testimony that guards at Adder [another of the SOC sites] worked six days a week and 12 hours a day).)

was no single uniform written policy in place from 2005 to 2012, nor a consistent practice of denying rest breaks during that time, Plaintiffs have failed to demonstrate that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Id.* at *13 (quoting Fed. R. Civ. P. 23(b)(3)).

This case presents similar circumstances. Just as class member testimony in *Autozone* contradicted the existence of a consistent break policy or practice, the class member testimony here contradicts the existence of a uniform understaffing practice uniformly resulting in overwork. Some class members worked more than 72 hours per week; some did not. In the absence of common proof, individual inquiries are necessary to determine whether class members actually worked more than 72 hours so as to give rise to liability. Common questions do not predominate over individual inquiries of more than 1,000 class members to determine liability.

## 2. Whether Effect of Uniform Practice Varied

Defendants also have adduced evidence that the effect of any understaffing practice varied based on the location where a class member was staffed as well as the class member's individual decisions about whether and why to work more than 72 hours per week.

Regarding location, class member testimony demonstrates that individuals at some sites never worked more than 72 hours per week while some individuals at other sites—the VBC sites, and especially LBS—consistently worked more than 72 hours per week. (*See* ECF No. 344 at 17-18.) For instance, one class member testified that his shifts were "always 12 hours" and that he "[a]lways had [his] day off" at Perfume Palace. (ECF No. 344-9 at 23.) Another testified that he "worked six days a week, ten hours a day," and "[a]lways" had Sundays off at Camp Slayer. (ECF No. 344-13 at 3.) Still another worked "12-hour shifts" at Camp Victory, where it was "pretty rare" to miss a day off. (ECF No. 344-33 at 3-4.) It is apparent from the record that LBS was uniquely demanding—so much so that guards working at LBS received an additional $500 for each full month at the site. (ECF No. 344 at 11.) Nevertheless, even at LBS, some class members did not work more

than 72 hours. For example, Muth testified that he never worked more than 12 hours in a shift or 6 days in a week at LBS. (ECF No. 344-2 at 3, 6.)

Those class members who worked more than 72 hours per week did not necessarily do so based on a uniform policy of understaffing. For instance, class member Robert Flores testified that his "responsibilities increased" during one period because "a sandstorm came in, and [command personnel] were stuck [in Kuwait] for two or three weeks."[7] (ECF No. 344-22 at 6.) Class members Christopher Cooper and Calvin Rouse recalled shifts at LBS going longer because of "weather conditions" (ECF No. 344-13 at 13) and "[v]ehicle problems," since "if [LBS] had any kind of rain . . . you got stuck in the mud" (ECF No. 344-9 at 12). In addition, some guards remained at LBS or asked to work at LBS in order to obtain the $500 monthly bonus that was only paid to guards at that site. (ECF No. 344 at-16 at 4; ECF No. 344-5 at 5; ECF No. 344-14 at 4.)

This case thus resembles *Marlo*, 639 F.3d 942. There, the district court initially certified a class of full-time UPS supervisors who alleged they did not receive overtime pay because they were misclassified as employees who were exempt from overtime pay. *Id.* at 944. In certifying the class, the district court relied on the plaintiff's common proof— a uniform overtime exemption policy. *Id.* at 945. The district court granted summary judgment in favor of UPS, the plaintiff appealed, and the Ninth Circuit reversed and remanded. *Id.* On remand, the district court decertified the class because the plaintiff had not adduced common evidence that each of the 1,200 full-time supervisors actually was misclassified as exempt. *Id.* The court found that the "existence of a uniform policy classifying [full-time supervisors] as exempt is insufficient absent evidence of misclassification." *Id.* The court also found that the plaintiff had "relied heavily on a survey that was neither reliable nor representative of the class." *Id.*

On yet another appeal the Ninth Circuit found that the district court did not abuse its discretion in decertifying the class. *Id.* at 946. The court rejected the plaintiff-appellee's

---

[7]Though the record does not expressly indicate that Flores worked more than 72 hours per week during this time, it is a fair inference to draw.

contention that a blanket exemption policy established misclassification because "the policy may have accurately classified some employees and misclassified others." *Id.* at 948. The court then rejected the plaintiff-appellee's argument that UPS's policies and procedures established sufficient evidence of predominance because those policies and procedures—requiring full-time supervisors to follow certain procedures or perform certain tasks—did not establish whether they were actually "primarily engaged" in exempt activities during the course of the workweek. *Id.* The court also found the plaintiff-appellee's remaining evidence of predominance—an annual employee survey conducted by UPS and a telephone survey—unpersuasive because neither was methodologically reliable. *Id.* at 948-49. The former was not limited to full-time supervisors, and the latter did not survey a representative sample. *Id.* at 949.

In the same way that UPS's policies and procedures did not necessarily show whether all full-time supervisors were actually engaged in activity that would qualify them as exempt in *Marlo*, Defendants' alleged uniform practice of understaffing does not necessarily show that guards actually worked more than 72 hours per week. Some guards may have worked more than 72 hours per week; some might not have. And that is exactly what the newly presented evidence shows. Plaintiff has offered no way to weed out class members who did not work more than 72 hours per week. And just as in *Marlo*, Plaintiff's additional evidence of damages (from which the Court might theoretically infer classwide injury) consists of a survey whose results cannot reliably be extrapolated to the whole class. (*See* ECF No. 281 at 12.)

This case also resembles *Wright v. Renzenberger, Inc.*, 656 F. App'x 835 (9th Cir. 2016). There, the district court declined to certify a class of employees who drove railroad crews between and within railroad yards. *Id.* at 837. The members of the proposed class alleged that their employer's rest break policies violated California law. *Id.* The district court denied class certification for lack of commonality, reasoning that the plaintiffs did not present a common injury or resolution when the employer's policies plainly complied with California law. *Id.* The Ninth Circuit found that the district court abused its discretion on

this point because the issue of "[w]hether [the employer's] policies complied with the law was a common question, whatever its merits." *Id.* Nevertheless, the Ninth Circuit affirmed the denial because common questions did not predominate. *Id.* at 838. The employer's policies provided for one paid 10-minute rest break for every four hours worked but counted waiting time and time in between yard moves as rest breaks. *Id.* at 837. The employees argued that these policies did not provide the statutorily required rest breaks because the employer did not guarantee any minimum amount of waiting time or time in between yard moves and made no effort to know in advance whether or when those waiting times would actually occur or how long they would last. *Id.* at 837. But the employees conceded that the amount of waiting time and time in between yard moves varied each day depending on numerous factors, such as the number of drivers, the number of trains, how far a driver has to travel, the number of vans available, whether there was a train derailment, and traffic. *Id.* at 838. Considering this variability, the Ninth Circuit found that the employer's policies did "not uniformly deprive employees of rest breaks; the effect of the policies depends instead on their interaction with these variables, which differ for each class member." *Id.* "Because these individualized determinations predominate over the common questions," the Ninth Circuit affirmed the district court. *Id.*

Just as the uniform rest break policies in *Wright* did not necessarily deprive drivers of rest breaks, any uniform understaffing practice here did not necessarily require guards to work more than 72 hours as further discovery has revealed. Rather, guards worked overtime for various reasons—e.g., weather, interest in extra pay—that "differ[ed] for each class member." *Id.* Those guards who worked more than 72 hours based on their interest in extra pay are particularly problematic for class litigation—their consent to work more than 72 hours precludes Defendants' liability to them. Plaintiff has offered no means for weeding out these class members, leaving only the possibility of individualized inquiries. Thus, individual questions predominate over common questions.

///

///

### B. Manageability (Superiority)

"In addition to predominance, Rule 23(b)(3) requires a court to find that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Autozone*, 2016 WL 4208200, at *13 (quoting Fed. R. Civ. P. 23(b)(3)). "Pertinent to that determination are 'the likely difficulties in managing a class action.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)(D)).

Defendants argue that Plaintiff cannot meet the manageability requirement of Rule 23(b)(3)(D) because Plaintiff has offered no classwide method for calculating damages. (*See* ECF No. 344 at 21-23.) Plaintiff argues that questions of individualized damages cannot be used to overcome class certification. (ECF No. 356 at 24-27.) The Court agrees with Defendants that the case has become unmanageable.

#### 1. Liability

Plaintiff has offered no way to determine liability on a classwide basis. Plaintiff relies on Defendants' alleged uniform practice of understaffing, but as explained *supra*, any such practice did not have uniform results. Some class members worked more than 72 hours; some did not. Plaintiff has failed to offer any methodology for determining which is which. Plaintiff suggests that the Court could make individualized determinations in the damages phase (*see* ECF No. 356 at 27), but Plaintiff presupposes liability as to each class member. That is not a foregone conclusion in light of Defendants' evidence that some class members never worked more than 72 hours per week. Thus, mini-trials of over 1,000 class members would be necessary—and unmanageable. "[S]omehow Plaintiff must demonstrate that [Defendants are] liable as to each class member," and Plaintiff has identified no way of doing so. *See Autozone*, 2016 WL 4208200, at *15. Thus, the Court faces a "nightmare" scenario of Plaintiff "call[ing] each class member into court to testify." *Id.* at 19. This class is not manageable.

#### 2. Damages

Plaintiff also has not offered any methodology for calculating damages on a classwide basis. Damages must be "capable of measurement on a classwide basis." *Doyle*

13

*v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013)). And while Plaintiff correctly points out that "the need for individualized findings as to the *amount* of damages does not defeat class certification," *id.* (quoting *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016)), it is not the individualized amount of damages that is problematic here—the question is whether some class members are owed any damages at all. Moreover, the Ninth Circuit has recognized that cases where a common methodology exists for calculating damages are different from cases where it does not. *See id.*

Here, Plaintiff has offered no methodology for calculating damages on a classwide basis. It is clear from the record that Plaintiff intended to offer the results of a census survey, but that did not pan out. (*See* ECF No. 281 at 12.) Plaintiff received 159 responses from a class of over 1,000 guards. (*Id.*) The Court already has determined that the results of that survey cannot reliably be extrapolated to the entire class. (*Id.*) Since that time, Plaintiff has failed to offer any alternative methodology for calculating damages. Plaintiff has not identified, for example, a "computerized payroll and time-keeping database [that] would enable the court to accurately calculate damages . . . for each claim." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Instead, Plaintiff suggests that a special master conduct over 1,000 individualized inquiries. This proposal further compels a finding of lack of manageability.

Accordingly, the Court finds that common questions do not predominate in this action and that the class would be unmanageable even if they did. The Court will grant Defendants' motion for decertification.

**V.     CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

///

It is therefore ordered that Defendants' motion to decertify class (ECF No. 344) is granted.

It is further ordered that the following motions are denied as moot: Defendants' second motion for summary judgment (ECF No. 342) and Plaintiff's emergency motion to strike Defendants' second motion for summary judgment (ECF No. 345).

The parties are instructed to file a joint status report within 7 days to advise the Court whether this case should be referred to the magistrate judge for settlement before the Court sets the deadline for filing the proposed joint pretrial order.

DATED THIS 26th day of July 2019.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE